*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PAMELA LEA GUERRERO, | ) | |
| | ) | Supreme Court No. S-15340 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-09-05651 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JUAN JOSE GUERRERO, | ) | |
| | ) | No. 7050 – September 18, 2015 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Michael Gershel, Anchorage, for Appellant. Guy Gautreau, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

WINFREE, Justice.

## I.    INTRODUCTION

A husband and wife dissolved their marriage, agreeing that the wife would receive the marital home and a portion of the husband's military retirement benefits and that the wife would remove the husband from the marital home mortgage. Two years later the wife sought a qualified retirement order to effectuate the property distribution. Following a protracted dispute over the wife's entitlement to the retirement and the wife's failure to remove the husband's name from the marital home mortgage, the

superior court refused to issue a qualified order because the husband's "retirement pay consist[ed] entirely of VA disability compensation and retirement [pay] for physical disability" and under federal law the disability compensation is not divisible marital property. The superior court also ordered the wife to remove the husband's name from the mortgage within 60 days. When the wife did not comply the court forced the home's sale. The superior court then awarded the husband prevailing party attorney's fees under Alaska Civil Rule 82.

The wife appeals, primarily challenging the superior court's refusal to divide the military retirement and the court's forced home sale. Although we affirm those decisions, we reverse the accompanying refusal to reopen the marital property division and remand for further proceedings. We therefore also vacate the superior court's prevailing party determination and attorney's fees award.

## II.    FACTS AND PROCEEDINGS

Juan and Pamela Guerrero married in 1997, divorced in 2005, remarried in 2006, and dissolved their second marriage in 2009. During the marriages Juan was a uniformed service member — he served in the Marines from August 1988 through August 1992 and in the Army between November 1993 and January 2012.

In March 2009 Juan and Pamela — each appearing pro se — petitioned for dissolution of their marriage. The petition included agreements that Juan must "allocate fifty percent (half) of his military retirement benefits to Pamela . . . due to 13 total years contributed to the marriage" and that Pamela would be awarded their home. In May Pamela and Juan appeared in court before a master. Pamela agreed to refinance the marital home within 18 months to remove Juan from the home's mortgage. They stated that they were satisfied with the property distribution and agreed that "50 percent of [Juan's] military retirement benefits during the 13 total years of marriage will be awarded to [Pamela]." The master clarified that even though they had divorced and then

remarried, they agreed that Pamela would receive half of the marital portion of Juan's military retirement over the duration of both marriages. In June the superior court granted the dissolution, finding "[t]he written agreements between the petitioners concerning . . . division of property, including retirement benefits, and allocations of obligations are just."

In July 2011 Pamela, appearing pro se, sought a qualified order to distribute Juan's military retirement. Juan, also appearing pro se, asserted that (1) the parties' dissolution agreement failed to take into account that the second marriage was only 41 months, and (2) Pamela had failed to refinance the marital home mortgage as required by the dissolution agreement. Pamela responded that she was unable to refinance or sell the marital home "due to the housing market" and that the master "did take into consideration the temporary break in marriage."

In November Juan received a letter notifying him that he was retired from the Army for permanent physical disability effective January 2012 — Juan had sustained serious combat-related injuries in Iraq in 2007, and as a result of those injuries Juan's lower right leg had been amputated in September 2010. In December Juan's lawyer entered his appearance. Shortly thereafter Pamela moved for documentation of Juan's military disability rating, explaining: "[Pamela's] retirement award is contingent on [Juan's] disability rating. Paperwork must be sent to [the Defense Financing and Accounting Service (DFAS)] in order for [Pamela] to receive retirement benefits."

In January 2012 Pamela moved for Juan to directly pay her for her share of his military retirement benefits because "DFAS is not required to begin payments to the former spouse until ninety (90) days after receipt of an acceptable order or the start of retired pay." Juan opposed, arguing "the remedy which [Pamela] is here requesting, is that [Juan] pay [Pamela] her share of the retirement benefits *prior* to his receiving those benefits. This is simply without merit. [Juan] cannot split marital proceeds which

he has not yet received." (Emphasis in original.)  Juan explained that Pamela "doesn't require a court order for any of these issues.  Rather, all she has to do is file a [form] with DFAS once this court issues its final orders and she can receive her ordered funds directly from DFAS."

The master ordered Juan to provide "any documents evidencing the status of his disability rating with the United States Military."  Juan's documents included an Army order stating "[y]ou are released from assignment and duty because of physical disability incurred while entitled to basic pay and under conditions that permit your retirement for permanent physical disability."  The Army order characterized Juan's disability as 70% and noted that the statute authorizing retirement was "1201."[1]

Pamela's lawyer entered an appearance in February.  Responding to Pamela's discovery requests, Juan provided his retiree account statement from DFAS.  The statement noted that Juan's monthly gross pay was $4,449, his monthly Veterans Affairs (VA) waiver was $1,424, Juan was exempted from taxes due to his disability status, and Juan's monthly concurrent retirement disability pay was $1,789.

In April the master held a hearing.  The parties' lawyers explained that they had been working on dividing Juan's military retirement using a qualified military retirement order (QMRO), but that they could not agree on indemnification language that arguably "could be interpreted to allow someone to come back and get disability pay when someone's retired pay is reduced."  Pamela's lawyer also expressed confusion about Juan's retirement, explaining:

> [W]e don't know what [Juan] is getting.  We don't know when he's getting it.  We don't know how it's composed.  I asked [Juan's lawyer] — and with all due respect to [Juan's

---

[1]    *See* 10 U.S.C. § 1201 (2012) (authorizing the armed services to retire disabled service members).

lawyer], it seems it was confusing to him as well. So I think [Juan] on the record can set us straight as to what he's getting, what it comprises and, frankly, if he intends to take any of this disposable retirement pay and turn it into disability pay . . . .

The parties also stated their positions on the marital home: Juan's lawyer asserted that Pamela "was ordered to sell the home. She had 18 months from May of '09 and that was never done." Pamela's lawyer argued that Pamela "was not ordered to sell the house, she was ordered to refinance the house and there [were] a number of things that were preventing the refinance all directly from [Juan]. Specifically, he did not give her a quitclaim deed so the house couldn't be refinanced without that."

Pamela asserted that when the parties agreed to dissolve the marriage she understood that Juan's retirement would be split 50/50. Pamela explained that she had a QMRO prepared by an expert and that she hoped the court would sign the order and submit it to DFAS. Pamela also noted that at the time of the hearing she did not know how long Juan had been receiving retirement benefits, how much he was receiving, and from what source. Finally, Pamela asserted that she was unable to sell or refinance the marital home.

Juan responded that Pamela had failed to remove his name from the marital home mortgage within the 18 months required by the dissolution order. Juan asserted that he received basically nothing in the dissolution agreement. Juan also explained that he received a 70% Army medical retirement ($4,445 monthly) and a 100% VA retirement benefit ($3,213 monthly). Juan stated that approximately $1,450 was waived from his Army medical retirement but that he would eventually receive that money from the VA. Juan's lawyer explained that the VA disability pay was not divisible by a QMRO but that 100% of the Army retirement was divisible. And Juan explained that his 70% Army disability rating entitled him to 70% of his $6,444 base pay but that if he

had retired based on years of service alone and without the disability he would only have been entitled to 50% of his base pay. Thus Juan asserted that only 50% of his base pay was divisible under a QMRO.

After the hearing the parties submitted competing QMRO's. Pamela's QMRO included a provision providing:

> If the Service Member takes actions that reduce[] his disposable retired pay and thereby reduces payments to the Former Spouse by the Designated Agent, the Service Member shall make direct payments to the Former Spouse in an amount sufficient to compensate the Former Spouse for such reduction immediately upon notice of such reduction, and shall also make up any arrearages in installments not less in amount or longer in term than the period over which the arrearages accrued.

Juan's QMRO did not contain this provision, and he argued:

> At the time of the dissolution, it was never agreed to by Juan that any changes in his disability pay would automatically be translated into additional pay for Pamela. It was never negotiated, is a new argument, and it is not conceded to now. In fact, Pamela already will receive a greater percentage of Juan's retirement pay since his disability raised his retirement pay amount from the normal 50% of base pay, to 70% of base pay.

In July 2012 Pamela, once again pro se, submitted notice to the court alleging that Juan "unilaterally converted all remaining disposable retirement pay to disability following the April 24th hearing." Pamela supported her assertion with a letter from DFAS explaining that "[t]he entire amount of [Juan's] retired/retainer pay is based on disability, thus there are no funds available for payment." In response Juan claimed that he took "no such action to convert or change any portion of his military benefits."

In November 2012 the parties again appeared before the master. The master explained that he was confused because Juan's retirement order stated that Juan's

disability rating was 70% but the letter Pamela received from DFAS explained that Juan was "a hundred percent disabled." Juan explained that the Army rated him at 70% disability and that the VA rated him at 100% disability. Juan further explained the Army rating meant that the Army had concluded Juan was entitled to 70% of his "base pay at the time of medical retirement" and that the VA rating meant that Juan qualified for "whatever the amount is that they give for a hundred percent." And Juan asserted that all of the money he received, from the Army and from the VA, was disability pay. Pamela insisted that Juan had elected to waive retired pay and that this decision prevented DFAS from sending her a portion of Juan's retirement.

The master issued a report recommending that the superior court require Pamela to refinance the marital home and deny her motion to divide the retirement. The master explained that Juan's retirement "is completely classified as disability pay. Disability pay is not dividable by the court as it is not a marital asset."

Pamela objected to the master's report and subsequently moved for permanent alimony and survivor benefits. The superior court issued an order treating Pamela's motion as "a motion for [Alaska Civil Rule] 60(b)(6) relief from judgment." The court explained that the parties had intended to split Juan's retirement, but because Juan's retirement pay was entirely disability pay it was not subject to division. The court found that the retirement pay was a fundamental underlying assumption of the dissolution that had been destroyed. The court also found that the property division was poorly thought out, that the dissolution was not reached with the help of counsel, and that the retirement was the parties' principal asset. The court therefore granted Rule 60(b)(6) relief from the original property distribution and ordered the parties to submit briefing to help the court equitably divide their marital property.

Pamela argued that Juan chose a disability retirement and unilaterally destroyed the portion they had agreed she would receive. Pamela requested that the

court consider issuing a qualified order or awarding her permanent alimony. Pamela also argued that the dissolution agreement required only that she refinance, it did not require that she sell the marital home. Pamela further asserted she was unable to refinance the home because she did not receive adequate child support, the home had no equity upon dissolution, and selling the home would "force both parties to incur additional financial distress at this time." Pamela finally submitted a list of marital assets and debts at the time of the parties' dissolution.

Juan acknowledged that he received disability retirement pay instead of regular retirement pay. He argued that he should be required to pay Pamela only a portion of the amount of money he would have received if he had retired based on years of service. But he asserted that for purposes of the marital property distribution the superior court should have recognized the parties' original divorce and calculated the marriage as only 41 months long. Juan also argued that the 18 months Pamela received to remove his name from the marital home had expired and that Pamela's inability to refinance the marital home and remove his name had negative ramifications for his credit. Juan also submitted a property spreadsheet, valuing the marital estate at the time of the parties' dissolution.

In August 2013 Pamela and Juan appeared before the superior court. The court explained that if it could determine Pamela's retirement entitlement based on the original agreement then it was inclined to reverse its decision to reopen the property distribution. Pamela agreed that she was only asking the court to address Juan's military retirement and that she was not asking the court to reopen the property distribution.

Shortly after the hearing the superior court issued an order, concluding that federal law "expressly excludes from [divisible] disposable retirement pay VA disability compensation and retirement for a physical disability" and that Juan's "military retirement pay consists entirely of VA disability compensation and retirement for

physical disability, leaving $0 of marital property for a state court to divide." The court reversed its Rule 60(b)(6) ruling, finding that no fundamental underlying assumption of the property division had been destroyed. The court noted the parties had agreed Pamela would receive a portion of Juan's retired pay, but due to his injuries his retirement pay was all disability pay and not divisible. The court rejected granting Pamela alimony because "calculating what [Juan] may have received in retirement had he not been disabled and couching it as spousal support is not only speculative but also violates the spirit of federal law." Finally, the court gave Pamela 60 days after the evidentiary hearing to refinance the marital home "and remove [Juan's] name from the mortgage or list the property for sale with a licensed realtor." The court ordered Juan to "motion the court for a clerk's deed" conveying the property to him to market and sell if Pamela failed to comply.

Pamela moved for reconsideration and for a quitclaim deed from Juan releasing his interest in the marital home. She argued that "the only blockade to removing [Juan's] name is [Juan's] un-cooperation in signing the Quit Claim Deed." Juan opposed, arguing that "there is no court order in existence requiring Juan to sign a quitclaim deed" and that "signing a quitclaim deed would not improve the current situation with the . . . property, in fact the result would be to give total autonomy over the . . . property to Pamela, . . . she has already defied a court order requiring her to sell [the property] for over three years and counting." Juan then moved for a clerk's deed so he could sell the property, and the superior court granted his request. Pamela moved again to revisit the military retirement, and the superior court denied this motion.

The superior court awarded Juan Alaska Civil Rule 82 prevailing party attorney's fees. First, the court awarded Juan 20% of his reasonable attorney's fees for litigation through the evidentiary hearing and the court's subsequent order. Then, after

denying Pamela's final motion to revisit the military retirement, the court awarded Juan full fees for responding to that motion.

## III.    STANDARD OF REVIEW

"We construe property settlement agreements in divorce actions in accordance with basic principles of contract law. Questions of contract interpretation are reviewed de novo."[2] "We review factual findings supporting a property division for clear error. We review de novo whether the superior court applied the correct legal rule."[3]

We review a trial court's decision to divide marital property through a qualified order for abuse of discretion.[4] But we review a trial court's attempts to effectuate a settlement agreement under "the same review principles we apply to contract disputes."[5] We therefore review the superior court's refusal to issue a qualified order de novo.[6]

---

[2]    *Glover v. Ranney*, 314 P.3d 535, 539 (Alaska 2013) (quoting *Hartley v. Hartley*, 205 P.3d 342, 346 (Alaska 2009)).

[3]    *Id.* (footnote omitted) (citing *Young v. Lowery*, 221 P.3d 1006, 1010 (Alaska 2009)).

[4]    *See Tillmon v. Tillmon*, 189 P.3d 1022, 1031-32 (Alaska 2008) ("The trial court did not abuse its discretion in entering [the] proposed [qualified order]. . . . The court did not abuse its discretion by using the [qualified order].").

[5]    *Krushensky v. Farinas*, 189 P.3d 1056, 1060-61 (Alaska 2008).

[6]    *See id.* ("Likewise, in entering the bench order that approved inclusion of [qualified pre-retirement survivor annuities] in QDROs, it appears the superior court was attempting to give effect to the parties' agreement as memorialized in the final property order. We therefore give that bench order de novo rather than deferential review.").

"We review for abuse of discretion an order denying a Rule 60(b) motion."[7] And "[w]e review a superior court's issuance of an order permitting the sale of property using the . . . abuse of discretion standard."[8]

"An award of attorney's fees, including a superior court's prevailing-party determination, is also reviewed for abuse of discretion. We review de novo whether the superior court applied the law correctly in awarding attorney's fees."[9]

## IV. DISCUSSION

### A. The Military Retirement Decisions

Military retirement benefits may be available for distribution as marital property under a complex federal framework. Because the parties' various arguments to the superior court were not always consistent with the applicable federal law, we provide legal background before analyzing their dispute.

#### 1. Military retirement pay and disability

Generally a uniformed service member may request to retire and receive longevity retirement benefits after completing 20 years of creditable service.[10] Longevity

---

[7] *Young v. Kelly*, 334 P.3d 153, 157 (Alaska 2014) (citing *Frost v. Ayojiak*, 957 P.2d 1353, 1355 (Alaska 1998)). *But see Heber v. Heber*, 330 P.3d 926, 930 (Alaska 2014) (explaining denials of Rule 60(b)(4) motions seeking relief from void judgments are reviewed de novo because "validity of a judgment is strictly a question of law" (quoting *Leisnoi, Inc. v. Merdes & Merdes, P.C.*, 307 P.3d 879, 884 (Alaska 2013))).

[8] *Watega v. Watega*, 143 P.3d 658, 663 (Alaska 2006).

[9] *Lee v. Konrad*, 337 P.3d 510, 518 (Alaska 2014) (footnote omitted).

[10] *See* 10 U.S.C. § 3914 ("[A]n enlisted member of the Army who has at least 20, but less than 30, years of service . . . may, upon his request, be retired.").

retirement benefits awards are a function of retired base pay[11] and 2.5 times the member's creditable years of service.[12] But if a member suffers a physical disability during service and as a result is unfit to perform Army duties, the Army may retire the member with disability retirement pay.[13] We refer to this latter form of retirement as Chapter 61 disability retirement.[14]

When a member receives a Chapter 61 disability retirement, the disability rating is stated as a percentage — e.g., 70% disabled.[15] A member retired from the Army for permanent physical disability may determine monthly retirement as a function of retired base pay and either the disability rating percentage or the creditable years of

---

[11] Retired base pay is the member's average monthly salary earned during the member's highest 36 months. *See* 10 U.S.C. § 1407(b) ("[T]he retired pay base or retainer pay base of a person under this section is the person's high-three average."); 10 U.S.C. § 1407(c) ("[T]he total amount of monthly basic pay to which the member was entitled for the 36 months . . . for which the monthly basic pay to which the member was the highest, divided by . . . 36 . . . .").

[12] The member's high 36 month salary is multiplied by a percentage — 2.5 times the member's creditable years of service stated as a percentage — in order to determine monthly retired pay. *See* 10 U.S.C. § 1401(a); 10 U.S.C. § 1409(b) ("[T]he percentage to be used . . . is the product (stated as a percentage) of . . . [2.5] and . . . the member's years of creditable service . . . .").

[13] *See* 10 U.S.C. § 1201(a) ("Upon a determination . . . that a member . . . is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay . . . , the Secretary may retire the member with retired pay computed under [10 U.S.C. § 1401] . . . .").

[14] *See* 10 U.S.C. ch. 61 §§ 1201-1222.

[15] *See* 10 U.S.C. § 1216a.

service percentage.[16]  The member "is entitled to be paid under the applicable formula that is most favorable."[17]

Chapter 61 disability retirement is not the only form of disability payment available to veterans.  Members who are disabled as a result of an injury suffered or aggravated in the line of duty also are entitled to Department of Veteran Affairs disability (VA disability).[18]  A member's entitlement to VA disability does not depend on a Chapter 61 decision to retire the member for permanent physical disability.[19]  Unlike the member's Chapter 61 disability rating — a rating based on the member's ability to perform Army duties[20] — the member's VA rating covers all disabilities suffered in the line of duty and may differ from the Chapter 61 rating.[21]  A member's VA disability

---

[16]     10 U.S.C. § 1401(a) (citing 10 U.S.C. §§ 1201, 1204).  When computing retirement as a function of the member's disability rating, the disability percentage used may not exceed 75%.  *Id.*

[17]     10 U.S.C. § 1401(b).  For example, a member retiring after 22 years of service would be entitled to 55% of the member's retired base pay (22 x 2.5 = 55).  If that member had been retired by the Army due to a permanent physical disability and had received a 60% disability rating, then the member would be entitled to receive 60% of retired base pay.  *See* 10 U.S.C. § 1401(a) (citing 10 U.S.C. §§ 1201, 1204).  And if that same member were retired by the Army due to a permanent physical disability with a 40% disability rating, then the member would still be entitled to 55% of retired base pay because payments are calculated using the formula that is most favorable to the member.  *See* 10 U.S.C. § 1401(b).

[18]     38 U.S.C. § 1110 (2012).

[19]     *See id.  See also* 38 U.S.C. § 1114 (compensation table).

[20]     10 U.S.C. § 1201.

[21]     38 U.S.C. § 1110.  *See also Myers v. United States*, 50 Fed. Cl. 674, 690 n.41 (Fed. Cl. 2001).

payment is a function of the member's VA disability rating and the member's number and type of dependents.[22]

Historically a member's receipt of VA disability payments was contingent on the member waiving an equal amount of retired pay.[23] But two programs now provide for concurrent receipt or repayment of waived retired pay.[24] Combat-related special compensation (CRSC) allows veterans disabled in combat to receive compensation in lieu of retirement payments up to the amount waived to receive VA disability benefits.[25] Concurrent retirement and disability pay (CRDP) is a phase-in program allowing qualifying disabled veterans to receive VA disability pay while waiving incrementally smaller amounts of retirement pay and providing for receipt of full retirement for all qualified disabled veterans pay by 2014.[26] Both programs include exceptions for

---

[22]    38 U.S.C. §§ 1114-1115.

[23]    38 U.S.C. §§ 5304-5305. Members have incentive to waive retired pay for VA disability payments because VA disability payments are not taxed. 26 U.S.C. § 104(a)(4).

[24]    *See* 10 U.S.C. §§ 1413a-1414.

[25]    *See* 10 U.S.C. § 1413a(a) ("The Secretary concerned shall pay to each eligible combat-related disabled uniformed services retiree who elects benefits under this section a monthly amount for the combat-related disability of the retiree determined under subsection (b)."); § 1413a(b) ("[T]he monthly amount to be paid an eligible combat-related disabled uniformed services retiree under subsection (a) for any month is the amount of compensation to which the retiree is entitled under title 38 for that month, determined without regard to any disability of the retiree that is not a combat-related disability. . . . The amount paid to an eligible combat-related disabled uniformed services retiree for any month . . . may not exceed the amount of the reduction in retired pay that is applicable to the retiree for that month under sections 5304 and 5305 of title 38.").

[26]    *See* 10 U.S.C. § 1414(a) ("[A] member or former member of the uniformed (continued...)

members retired by the Army under Chapter 61, limiting CRSC to an amount equal to the member's longevity retirement[27] or requiring waiver of concurrent retired pay exceeding the amount the member would have received from a longevity retirement.[28]

### 2. Equitably dividing military retirement pay

The Uniformed Services Former Spouses Protection Act (USFSPA) provides that state courts "may treat *disposable retired pay* payable to a member . . . either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court."[29] USFSPA defines disposable retired pay:

---

[26]     (...continued)
services who is entitled for any month to retired pay and who is also entitled for that month to veterans' disability compensation for a qualifying service-connected disability . . . is entitled to be paid both for that month without regard to sections 5304 and 5305 of title 38. During the period beginning January 1, 2004, and ending on December 31, 2013, payment of retired pay to such a qualified retiree is subject to [a phase-in schedule] . . . .").

[27]     *See* 10 U.S.C. § 1413a(b)(3)(A) ("In the case of an eligible combat-related disabled uniformed services retiree who is retired under chapter 61 of this title, the amount of [CRSC] . . . for any month may not, when combined with the amount of retired pay payable to the retiree after any such reduction under sections 5304 and 5305 of title 38, cause the total of such combined payment to exceed the amount of retired pay to which the member would have been entitled under any other provision of law based upon the member's service in the uniformed services if the member had not been retired under chapter 61 of this title.").

[28]     *See* 10 U.S.C. § 1414(b)(1) ("The retired pay of a member retired under chapter 61 of this title . . . is subject to reduction under sections 5304 and 5305 of title 38, but only to the extent that the amount of the member's retired pay under chapter 61 of this title exceeds the amount of retired pay to which the member would have been entitled under any other provision of law based upon the member's service in the uniformed services if the member had not been retired under chapter 61 of this title.").

[29]     10 U.S.C. § 1408(c)(1) (emphasis added).

[T]he total monthly retired pay to which a member is entitled *less amounts which —*

. . . .

(B) are deducted from the retired pay of such member as a result of forfeitures of retired pay ordered by a court-martial or as a result of a *waiver of retired pay required by law in order to receive compensation under title 5 or title 38*;

(C) *in the case of a member entitled to retired pay under chapter 61 of this title, are equal to the amount of retired pay of the member under that chapter computed using the percentage of the member's disability on the date when the member was retired . . . .*[30]

In *Mansell v. Mansell* the United States Supreme Court applied USFSPA to retired pay waived in order to receive VA disability benefits, holding that USFSPA "does not grant state courts the power to treat as property divisible upon divorce military retirement pay that has been waived to receive veterans' disability benefits."[31] We applied *Mansell* in *Clauson v. Clauson*, noting that state courts do not have any power to "equitably divide veterans' disability benefits received in place of waived retirement pay."[32] But we clarified that "neither the USFSPA nor prior Supreme Court decisions require our courts to completely ignore the economic consequences of a military retiree's decision to waive retirement pay in order to collect disability pay."[33] We therefore considered "the economic consequences of a decision to waive military pay in order to receive disability pay" — in *Clauson* the member's former spouse was barred from

---

[30]     10 U.S.C. § 1408(a)(4) (emphasis added).

[31]     490 U.S. 581, 594-95 (1989).

[32]     831 P.2d 1257, 1262 (Alaska 1992).

[33]     *Id.* at 1263.

receiving an agreed upon share of the military retirement benefits — and affirmed the superior court's decision to grant the spouse's Rule 60(b)(6) motion reopening the parties' property settlement agreement.[34] We finally explained that when reopening a property distribution trial courts may not "simply shift an amount of property equivalent to the waived retirement pay from the military spouse's side of the ledger to the other spouse's side. . . . Disability benefits should not, in either form or substance, be treated as marital property subject to division upon the dissolution of marriage."[35]

In *Young v. Lowery* we affirmed our *Clauson* decision and held that "a court may not equitably divide total retired pay; it may equitably divide only the amount of retired pay remaining after the court deducts waived retired pay and the cost of purchasing survivor benefits."[36] We also held that "the trial court may expressly order [the service member] not to reduce his disposable retired pay and require [him] to indemnify [the former spouse] for any amounts by which her payments are reduced below the amount set on the date the amended qualified order is entered."[37]

### 3. Unraveling Juan's retirement pay

In the superior court the parties may have been confused about the nature of Juan's retirement benefits and whether they were divisible in whole or in part. The undisputed evidence in the record establishes the following: Juan was Chapter 61 retired for permanent physical disability under 10 U.S.C. § 1201; the Army rated Juan's permanent disability at 70%; because Juan's 70% disability rating exceeded his

---

[34] *Id.* at 1261-64.

[35] *Id.* at 1264.

[36] 221 P.3d 1006, 1011 (Alaska 2009).

[37] *Id.* at 1012-13.

retirement pay multiplier[38] Juan was entitled to have his Chapter 61 disability retirement pay calculated using his disability rating;[39] Juan's retirement base pay was $6,355, and his gross Chapter 61 retirement pay was $4,449.[40] Juan also received at least $3,213 in monthly VA disability payments, and his monthly VA waiver was $1,424.[41]

### 4. The superior court's retirement benefits rulings

The master's report explained that Juan's retirement "is completely classified as disability pay. Disability pay is not [divisible] by the court as it is not a marital asset." And the superior court explained that "[b]ecause of [Juan's] disability, the government classifies all of his retirement as disability pay, leaving zero disposable retirement pay for a state court to distribute in a divorce."

Pamela asserts that the superior court is incorrect because "based on Juan's own pay statement, it appears that at least a portion of Juan's pay was divisible and that

---

[38] Juan's exact retirement pay multiplier is not clear from the record, but based on 23 years of service it could not have exceeded 57.5%. And Juan testified that he took a career service bonus in 2004 that paid him $30,000 but decreased his retirement pay multiplier by 10% to 47.5%.

[39] *See* 10 U.S.C. § 1401(b) ("If a person would otherwise be entitled to retired pay computed under more than one formula . . ., the person is entitled to be paid under the applicable formula that is most favorable to him."). Based on approximately 23 years of service Juan's longevity-based retirement pay multiplier could not have exceeded 57.5%, but Juan's 70% disability rating provided for his receipt of 70% of his retired base pay. *See* 10 U.S.C. § 1401(a).

[40] Juan's Chapter 61 pay was based on his 70% disability rating — $6,355 x .70 = $4,449.

[41] Juan had to waive a portion of his Chapter 61 disability because Chapter 61 payments may only be received concurrently with VA disability payments up to "the amount of retired pay to which the member would have been entitled under any other provision of law based upon the member's service in the uniformed services if the member had not been retired under chapter 61 of this title." 10 U.S.C. § 1414(b)(1).

Pamela would be receiving some of these funds if the trial court had issued a qualifying order." Pamela specifically argues that Juan received CRDP[42] and that "CRDP is divisible upon divorce."

But CRDP does not change the nature of Juan's Chapter 61 retirement benefit. Juan's benefits come from two sources — Chapter 61 disability retirement and VA disability payments. Neither source is divisible upon divorce. USFSPA excludes from disposable retired pay all Chapter 61 retirement benefits "equal to the amount of retired pay . . . computed using the percentage of the member's disability."[43] And as we held in *Clauson v. Clauson*, state courts have no power to equitably divide VA disability benefits.[44] VA disability benefits are not retired pay and do not fall within USFSPA's definition of disposable retired pay.[45]

Juan's Chapter 61 retirement payments were computed using the percentage of his disability rating and are not divisible: Juan was 70% disabled, and his gross retired pay was 70% of his retired base pay. And contrary to Pamela's assertion that "CRDP is divisible upon divorce" — Juan was receiving $1,789 CRDP — the CRDP portions of Juan's Chapter 61 payments are not divisible.[46] CRDP provides for concurrent receipt of VA disability benefits and military retirement pay.[47] If the concurrently received retirement payments are disposable retired pay under USFSPA,

---

[42] *See supra* note 26 (explaining CRDP).

[43] 10 U.S.C. § 1408(a)(4)(C).

[44] 831 P.2d 1257, 1264 (Alaska 1992).

[45] *Id.* at 1262-64; 10 U.S.C. § 1408(a)(4)(B).

[46] *See* 10 U.S.C. § 1408(a)(4)(C).

[47] 10 U.S.C. § 1414.

then the retirement payments are divisible.  Chapter 61 disability retirement payments computed based on a member's disability percentage are not disposable retired pay under USFSPA — even when received concurrently with VA disability.[48]  DFAS recognized that Juan received no disposable retired pay and notified Pamela that "[t]he entire amount of the member's retired/retainer pay is based on disability, thus there are no funds available for payment under the USFSPA."

Because Juan's military benefits consist entirely of Chapter 61 retirement and VA disability, the superior court did not err when concluding that none of Juan's military benefits were disposable retired pay.

### 5.    Pamela's requested presumption

Pamela argues that we "should establish a presumption that military qualifying orders shall contain indemnity provisions, to protect the former spouse from a post-decree waiver of military retired pay."  Pamela correctly notes that we have approved the use of indemnity clauses in QMROs.[49]  But we have only approved the use of indemnity clauses to reimburse spouses for reductions in disposable retirement pay

---

[48]    10 U.S.C. § 1408(a)(4)(C).

[49]    *See Glover v. Ranney*, 314 P.3d 535, 543 (Alaska 2013) ("Rather than improperly dividing waived benefits, the order awards [the wife] her time rule percentage of disposable retirement pay while requiring [the husband] to indemnify [her] for any subsequent unilateral actions to decrease the total monthly pension payout amounts. The superior court did not err — the order complies with [USFSPA] and our precedent."); *Young v. Lowery*, 221 P.3d 1006, 1012-13 (Alaska 2009) ("But the trial court may expressly order [the husband] not to reduce his disposable retired pay and require [him] to indemnify [the wife] for any amounts by which her payments are reduced below the amount set on the date the amended qualified order is entered.").

due to members' unilateral waiver of disposable retirement benefits in exchange for VA disability payments.[50]

In this case, despite Pamela's contrary assertions, Juan did not unilaterally waive any disposable retired pay. Juan asserted that he took "no such action to convert or change any portion of his military benefits." The record supports Juan's assertion. When Juan was Chapter 61 retired by the military, the military had to find that Juan was "unfit to perform the duties of [his] office, grade, rank, or rating because of physical disability."[51] Juan was retired with a 70% disability rating and was awarded 70% of his retirement base pay despite Juan's years of service otherwise entitling him to no more than 57.5% of his base pay. As explained above, the entirety of Juan's retirement pay was based on his Chapter 61 disability rating and on his VA disability, and under USFSPA this money is not considered disposable retired pay.[52] Unlike VA disability which a member may elect,[53] a member does not unilaterally choose to become Chapter 61 retired. Rather, Chapter 61 retirement for permanent disability is based on the Army's determination that the member's permanent injuries are so severe that the member is unfit to perform Army duties.[54] And when a member waives a portion of Chapter 61 disability pay to receive VA disability, it is not a waiver of disposable retired

---

[50] *See Glover*, 314 P.3d at 543; *Young*, 221 P.3d at 1012. And in *Clauson v. Clauson*, we focused on the "military retiree's decision to waive retirement pay in order to collect disability." 831 P.2d 1257, 1263 (Alaska 1992).

[51] 10 U.S.C. § 1201(a).

[52] *See supra* Part IV.A.4.

[53] *See* 38 U.S.C. § 5100 ("[T]he term 'claimant' means any individual applying for, or submitting a claim for, any benefit under the laws administered by the Secretary.").

[54] 10 U.S.C. § 1201(a).

pay. Rather it is a waiver of one type of payment that is not considered disposable retired pay — Chapter 61 disability — in exchange for another — VA disability.

Pamela fails to recognize the distinction between a member unilaterally deciding to waive disposable retired pay in exchange for VA disability benefits, and a member receiving only two types of nondisposable retired pay after the member is Chapter 61 retired by the Army. The majority of cases Pamela cites supporting her indemnification argument explicitly address waiver of disposable retired pay for VA disability — as opposed to a member receiving and waiving a Chapter 61 disability retirement — and they assert that indemnification is proper because it would be unfair to let the member unilaterally waive disposable retired pay.[55]

---

[55]    *See, e.g.*, *Danielson v. Evans*, 36 P.3d 749, 751, 755 (Ariz. App. 2001) (addressing "non-disability retirement" pay "waived in order to receive disability benefits"); *Surratt v. Surratt*, 148 S.W.3d 761, 767 (Ark. App. 2004) ("[The member] could not, by later waiving those benefits in order to receive disability payments, unilaterally deprive [his former spouse] of her property."); *Blann v. Blann*, 971 So. 2d 135, 137 (Fla. App. 2007) ("[T]he trial court erred in concluding that there was no authority to enforce the consent final judgment by ordering the former husband to indemnify the former wife after he waived a portion of his military retirement pay so that he might receive veteran's disability benefits."); *In re Marriage of Neilsen & Magrini*, 792 N.E.2d 844, 849 (Ill. App. 2003) ("Based on the foregoing persuasive authority, we believe that a party's vested interest in a military pension cannot be unilaterally diminished by an act of a military spouse . . . ."); *Bandini v. Bandini*, 935 N.E.2d 253, 264 (Ind. App. 2010) ("For the foregoing reasons, we hold that a military spouse may not, by a post-decree waiver of retirement pay in favor of disability benefits or CRSC, unilaterally and voluntarily reduce the benefits awarded a former spouse in the dissolution decree."); *Dexter v. Dexter*, 661 A.2d 171, 175 (Md. Spec. App. 1995) ("We hold that the voluntary waiver of appellant's Army retirement pension was under Maryland law a breach of contract, for which the measure of past damages is the amount the receiving spouse would have received had the appellant not committed the breach."); *Krapf v. Krapf*, 786 N.E.2d 318, 325 (Mass. 2003) ("While not dispositive on this matter of first impression in Massachusetts, we note that many other State appellate courts have

(continued...)

We do not adopt an indemnification presumption in this case because waiver of Chapter 61 retirement benefits is not waiver of disposable retired pay. Requiring indemnification when a member is Chapter 61 retired is akin to an unacceptable division of retirement benefits which are not disposable retired pay — a division foreclosed by USFSPA, *Mansell*, and *Clauson*.[56]

### 6.	The superior court's QMRO ruling

Pamela argues that "the trial court erred when it declined to enter a qualif[ied] order apportioning Juan's military retirement benefits." She notes that granting a QMRO is a ministerial act that gives effect to a court-approved property settlement. Pamela also argues that if the court had issued a QMRO then she might have received retirement payments. She finally argues that even if the court correctly

---

[55]	(...continued)
ordered similar relief against military retirees who waive the military retirement benefits pledged to a former spouse under a separation agreement in order to obtain VA disability payments."); *Megee v. Carmine*, 802 N.W.2d 669, 682 (Mich. App. 2010) ("We hold that a military spouse remains responsible to compensate [a] former spouse . . . when the military spouse makes a unilateral and voluntary postjudgment election to waive the retirement pay in favor of disability benefits contrary to the terms of the divorce judgment."); *Shelton v. Shelton*, 78 P.3d 507, 508 (Nev. 2003) ("Roland elected to waive all his military retirement benefits for an equivalent amount of tax-exempt disability pay as federal law allows."); *Hisgen v. Hisgen*, 554 N.W.2d 494, 496 (S.D. 1996) ("We consider whether a court may require a former spouse to pay as part of a property division an amount equivalent to one-half of a military retirement entitlement when such spouse has waived retirement benefits to receive a corresponding sum in veteran's disability payments."); *Johnson v. Johnson*, 37 S.W.3d 892, 897 (Tenn. 2001) ("We hold that when an [agreement] divides military retirement benefits, the non-military spouse has a vested interest in his or her portion of those benefits . . . . That vested interest cannot thereafter be unilaterally diminished by an act of the military spouse.").

[56]	10 U.S.C. § 1408(a)(4); *Mansell v. Mansell*, 490 U.S. 581, 594-95 (1989); *Clauson v. Clauson*, 831 P.2d 1257, 1264 (Alaska 1992).

concluded that she would receive no direct payments from DFAS, the failure to issue a QMRO was still reversible error.

We have explained that a qualified order "simply enforces a court order calling for division of retirement benefits."[57] As Juan notes, the record establishes that a QMRO would not have resulted in any payments to Pamela directly from DFAS because Juan's benefits were entirely based on his disability. And as explained in the previous subsection, requiring Juan to directly indemnify Pamela because he was Chapter 61 retired by the Army violates USFSPA, *Mansell*, and *Clauson*.[58] We therefore conclude that the superior court did not err when refusing to issue an ineffectual order.[59]

### 7. The superior court's Rule 60(b) ruling

Pamela argues that the superior court "erred when it declined to provide [her] with any offset for the benefits she lost due to Juan's receipt of disability benefits." Although she asserts that this case is not governed by Rule 60(b) because she "was still seeking . . . issuance of the qualifying military order," she also argues that she was entitled to an "adjustment to the property division, following Juan's waiver of retirement pay" and that the "failure to address Pamela's loss of all interest in the retirement benefits constituted an abuse of discretion." At one point Pamela had asked the superior court for a spousal support award in lieu of Juan's military benefits. Pamela, at the time

---

[57] *Zito v. Zito*, 969 P.2d 1144, 1146 (Alaska 1998).

[58] 10 U.S.C. § 1408(a)(4); *Mansell*, 490 U.S. at 594-95; *Clauson*, 831 P.2d at 1264.

[59] The provision that Pamela requested below required indemnification when "the Service Member takes actions that reduce[] his disposable retired pay and thereby reduces payments to the Former Spouse." But Juan's Chapter 61 retirement is a result of the Army's determination regarding his ability to perform his duties, and not based on any unilateral waiver of retired pay. Thus the specific QMRO Pamela sought would not have resulted in her receipt of any of Juan's military retirement benefits.

litigating pro se, thus appears to have attempted to request a modification of the parties' dissolution agreement, and we consider this a request for Rule 60(b)(6) relief from judgment.[60]

Rule 60(b)(6) is a catch-all provision, justifying relief from property settlement agreements under extraordinary circumstances.[61]

> In the context of a property division pursuant to a divorce, four "extraordinary circumstances" may justify relief under Rule 60(b)(6): (1) the fundamental, underlying assumption of the dissolution agreement has been destroyed; (2) the parties' property division was poorly thought out; (3) the property division was reached without the benefit of counsel; and (4) the property in dispute was the parties' principal asset.[62]

The four factors "are not strictly necessary conditions but, rather, are particular instantiations of the equitable factors required to overcome the principle that, at some

---

[60] *See O'Link v. O'Link*, 632 P.2d 225, 227-28 (Alaska 1981) (treating request to modify divorce decree "as requests for relief from judgment under Civil Rule 60"). We consider Pamela's request for spousal support a Rule 60(b)(6) motion in spite of Pamela's own lawyer's contrary assertions on appeal and Pamela's statements to the superior court. Pamela was pro se when she requested spousal support, and she was pro se when she informed the superior court that she did not want to "reopen the entire property." We interpret the pleadings of pro se litigants leniently. *DeNardo v. Calista Corp.*, 111 P.3d 326, 331 (Alaska 2005). It is clear that Pamela requested spousal support in the event she was unable to receive her agreed upon share of Juan's military retirement. It is not clear that Pamela understood her statements to the superior court to mean she was relinquishing her request for spousal support in lieu of Juan's military retirement.

[61] *Sandberg v. Sandberg*, 322 P.3d 879, 888-89 (Alaska 2014).

[62] *Cook v. Cook*, 249 P.3d 1070, 1084 (Alaska 2011).

point, litigation must be brought to an end."[63]  "Trial courts should use these factors when appropriate, but should also bear in mind the flexible nature of Rule 60(b)(6), keeping in mind that '[t]he broad power granted by clause (6) is not for the purpose of relieving a party from free, calculated, and deliberate choices he has made . . . .' "[64]

The superior court applied the Rule 60(b)(6) factors and initially concluded that relief was warranted because:

> (1) [Juan's] retirement was a fundamental, underlying assumption of the Guerreros' dissolution agreement and it is destroyed, (2) the parties' property division was poorly thought out because it entirely failed to dispose of [Juan's] retirement, (3) neither party had legal counsel when they entered into the dissolution agreement, and (4) [Juan's] retirement was the parties' principal asset.

But the superior court later reversed its initial Rule 60(b)(6) ruling "because upon further review [the court] does not find that a fundamental underlying assumption of the dissolution agreement is destroyed."  The superior court noted "had the Court not reversed its [Rule] 60(b) order, the Court would have reconsidered the entire 2009 property distribution."

The record establishes that both parties believed Pamela was entitled to receive some portion of Juan's military benefits.  While Juan disputed the total amount of his benefits Pamela would receive, Juan consistently recognized Pamela should receive some portion of his military benefits.  Thus it was error to determine that a fundamental underlying assumption of the parties' agreement had not been destroyed.  Due to Juan's Chapter 61 retirement by the Army he received no disposable retired pay,

---

[63]     *Sandberg*, 322 P.3d at 889 (quoting *Clauson*, 831 P.2d at 1261).

[64]     *Id.* (alteration in original) (quoting *O'Link*, 632 P.2d at 229-30).

and this destroyed the parties' expectation that Pamela would receive some portion of Juan's military benefits.

The superior court's earlier analysis of the other factors also is persuasive. The property division was poorly thought out. Despite knowing that Juan was seriously injured in 2007, the parties failed to recognize the possibility that Juan would receive no disposable retired pay, operating under the assumption that Pamela would be able to receive Juan's military benefits. And neither party was represented by counsel when they dissolved their marriage and settled their property. Finally, Juan's retirement was the parties' principal asset.[65]

Juan argues that the superior court concluded "that the property distribution was still equitable, despite the non-divisibility of retirement pay, considering that the 2009 dissolution was exceptionally favorable to Pamela." But as Pamela correctly notes, the superior court "never engaged in an equitable division analysis," and without taking additional testimony regarding marital property and property values the court had insufficient evidence to conduct such an analysis.

Because it was an abuse of discretion to refuse to reopen the property settlement agreement and conduct a full equitable division analysis, we reverse the Rule 60(b)(6) decision and remand for further proceedings and a marital property distribution. We reiterate our *Clauson* holding that on remand the superior court may not "simply shift an amount of property equivalent to the . . . retirement pay from the military spouse's side of the ledger to the other spouse's side."[66] But we note that Juan's and Pamela's financial conditions, including Juan's receipt of his military disability

---

[65] The parties' 2009 dissolution agreement was not detailed and did not reveal the equity, if any, in their real property. But in 2009 Juan was very close to 20 years of service and a guaranteed Army retirement, a valuable asset.

[66] *Clauson*, 831 P.2d at 1264.

retirement benefits, must be considered when equitably dividing the marital estate and when deciding whether to require alimony.[67]

## B. The Forced Sale Of The Marital Home

### 1. The superior court's refusal to require Juan to sign a quitclaim deed

Under the dissolution agreement Pamela received the jointly owned marital home. At their dissolution hearing Juan and Pamela agreed that she would refinance the home and remove Juan's name from the mortgage. Pamela asserts that "[a]s part of the property division, Juan was to quitclaim the property." She argues that the superior court erred by refusing to force Juan to sign a quitclaim deed. And she further argues that Juan's failure to provide her a quitclaim deed made it impossible for her to refinance the home and remove his name from the mortgage.

But Pamela fails to point to any agreement or any statement of law supporting her position that a quitclaim deed was a condition precedent to her removing Juan's name from the mortgage. And Pamela's own trial theory and testimony provided the superior court with extrinsic evidence that the parties did not intend that a quitclaim deed was a condition precedent.[68] Pamela's lawyer first mentioned the lack of a quitclaim deed in April 2012, far past the 18-month deadline that the parties agreed to in 2009. But even then her lawyer did not assert that a quitclaim deed was a condition precedent to her obligation to refinance. The lawyer instead agreed with the court that "one way in procedure" is to deliver the quitclaim deed "at closing of the refinance, not

---

[67]     AS 25.24.160(a)(2)(D), (a)(4)(D).

[68]     *Hartley v. Hartley*, 205 P.3d 342, 347 (Alaska 2009) ("A court must resolve any ambiguity in contract language by determining the reasonable expectations of the contracting parties in light of 'the language of any disputed provisions, other provisions, relevant extrinsic evidence, and case law interpreting similar provisions.' " (quoting *Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993))).

before, to protect [Juan's] interest." And when questioned at that hearing regarding her failure to remove Juan's name, Pamela testified that the house would not sell and that she could not refinance due to her "debt to income ratio."

Because the property settlement did not explicitly require Juan's quitclaim as a condition precedent to Pamela's obligation to refinance the house, because extrinsic evidence establishes that Pamela did not consider Juan's quitclaim obligation a condition precedent, because the quitclaim deed could have been tendered at a closing, and because there is evidence that Pamela was simply unable to refinance the home, we conclude the superior court did not abuse its discretion when refusing to require Juan to sign a quitclaim deed.

### 2.    The superior court's forced sale of the home

Pamela argues that the superior court erred when providing for the forced home sale "because it was Juan — and the trial court itself — that had created the putative need for the sale." She asserts that the court's refusal to order a quitclaim deed, the court's decision on Juan's retirement benefits, and Juan's alleged child support arrears prevented her from refinancing the home. Pamela's assertions do not establish that the superior court erred.

In her brief Pamela notes that "the forced sale of a home is within the trial court's power, in order to effectuate the terms of a property division."[69] She nonetheless argues that such an extreme step was not appropriate in this case. But Pamela's argument does not address her failure to refinance the home or request any form of relief within the agreed upon 18 months. She only sought the court's help in 2011 while the parties were litigating the military retirement benefit issue.

---

[69]    *See Worland v. Worland*, 240 P.3d 825, 829 (Alaska 2010).

After more than four years Pamela had failed to refinance the home, and the superior court provided her with a final 60 days. Regardless of Pamela's later-asserted reasons for her failure to refinance, Pamela had not fulfilled her contractual obligation and had not initially justified her failure to perform. And as explained above, Juan was not obligated to provide a quitclaim deed; nor did the superior court's military retirement decision, after Juan was Chapter 61 retired in 2012, prevent Pamela from refinancing the home between 2009 and 2011.

Because Pamela failed to seek any relief within the 18 months provided under the property settlement agreement, we conclude that the superior court did not err when ordering the forced sale of the home.

## C. The Attorney's Fees Awards

Because we reverse the superior court's Rule 60(b)(6) decision, we vacate the attorney's fees awards. The superior court may make a new prevailing party determination and attorney's fees calculation at the conclusion of the proceedings on remand.

## V. CONCLUSION

We AFFIRM the superior court's decision not to divide Juan's military disability retirement pay and not to issue a QMRO. We AFFIRM the superior court's decision to force the sale of the marital home. Because exceptional circumstances justify reopening the marital property agreement, we REVERSE the superior court's Rule 60(b)(6) decision and REMAND for an equitable marital property distribution; and we VACATE the attorney's fees awards.