*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| THOMAS E. JORDAN, | ) | |
| | ) | Supreme Court No. S-17490 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-17-11213 CI |
| v. | ) | |
| | ) | O P I N I O N |
| CHERYL A. JORDAN, | ) | |
| | ) | No. 7504 – February 12, 2021 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Rhonda Butterfield and Douglas Ryan, Wyatt & Butterfield LLC, Anchorage, for Appellant. Steven Pradell, Steven Pradell & Associates, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

WINFREE, Justice.

## I.      INTRODUCTION

Following a divorce trial the superior court unevenly divided a marital estate. The smaller share recipient appeals several points related to findings about alleged marital waste, calculations concerning the parties' future earning capacities, and consideration of federal disability benefits. We affirm the court's marital waste ruling,

but we remand for further proceedings addressing its calculation of the parties' earning capacities and its consideration of federal disability benefits.

## II.    FACTS AND PROCEEDINGS

### A.    Overview

Thomas and Cheryl Jordan married in 1993. Thomas worked as a dentist; through a military commission, he began working for the federal Public Health Service in 1988. He retired in 2015 with a military pension and veteran (VA) disability benefits. He also had accumulated about $582,000 in retirement accounts by 2017. Cheryl worked as an administrative assistant before leaving employment in 2006. She had accumulated about $655,000 in retirement accounts by 2017.

In 2004 they purchased a home in Sitka; in 2006 they purchased a second home in Sitka to use as their residence and began using the first home as a rental property. Cheryl also began operating a bed and breakfast (B&B) business on the lower floor of their residence. They purchased a duplex in Ketchikan in 2014, reserving one unit for occasional personal use and renting out the other unit.

In September 2017 Cheryl moved to the Ketchikan duplex, and she filed for divorce in October. In January 2018 Cheryl sought interim relief. She requested, among other things, possession of the Ketchikan duplex. Thomas did not oppose her request, but he argued that Cheryl had committed marital waste by abandoning the B&B. Cheryl replied that she felt she had no choice but to leave Sitka because she feared for her life. Arguing that Thomas had "[u]nilaterally closed . . . down" the B&B and that he should not have done so "without [her] approval," she then asked the court to award her interim possession of their Sitka residence so she could operate the B&B. At a May evidentiary hearing the court said that Cheryl could "shut down" the B&B because "she will not be operating it this year." The court granted interim possession of the Ketchikan duplex to Cheryl and the Sitka residence to Thomas, along with other interim relief.

Trial was held over three days in August. The parties stipulated to value the Sitka properties at $750,000 for the residence and $430,000 for the rental. The superior court adopted the stipulated values, noting that the residence's property value was separate from the B&B's business value.

Cheryl requested a 60/40 marital asset division. Cheryl testified that she believed Thomas could continue working; she contended that he is "young" and "healthy," that he provided no documentation indicating he is unable to work, and that he could "probably do administrative work . . . as well." Thomas contended there was no reason to depart from a 50/50 division. He argued that Cheryl could work another 5 to 15 years in an office or running a B&B. Thomas stressed that the most relevant factors for the court's consideration were income-producing property, age, health, and Cheryl's unreasonable depletion of marital assets. He contended that earning capacity was not as significant a factor because his capacity was "coming to a close" due to his health issues.

Relevant to this appeal, trial issues included the parties' future earning capacities, the Ketchikan duplex's value, the B&B's business value and operation, and the reasons Cheryl left Sitka.

B. **The Parties' Earning Capacities And Health**

Thomas was 56 years old at the time of the trial; he testified that he had worked for the federal Public Health Service as a dentist from 1988 until retiring in November 2015 and that he then had taken a different full-time dentist job. Thomas described a number of his health issues, including arthritis in his hands, vision problems, fainting spells, and "lower back problems," including "compressed" discs from "sitting and twisting and turning, doing dentistry for 30 years." When asked whether he could continue working in "administrative functions" as he gets older, Thomas said he could not. Thomas stated that he "would love to retire," that he "plan[s] on retiring very soon,"

and that he was working at the time of trial only to avoid wasting marital assets. He explained that he receives federal military retirement benefits of $9,430.13 monthly, including $1,686.13 in VA disability pay.

Cheryl was 55 years old at the time of the trial; she testified that she had not worked since she left Sitka in September 2017 and that she was in good health. She stated that she had operated the B&B since 2006 and that its income fluctuated annually. She described her work history, including her work as an administrative assistant. Cheryl testified that she had not worked outside the home since 2006 but could easily obtain an entry-level office job.

### C. The Ketchikan Duplex's Valuation

Each party had an appraiser value the Ketchikan duplex. Cheryl's appraiser valued it at $385,000. Thomas's appraiser valued it at $455,000. Neither appraiser conducted a formal review of the other appraiser's report. Cheryl's attorney indicated concern because Thomas's appraiser had purchased a property that Cheryl's appraiser had used for a comparable. The court indicated that it would not exclude Thomas's appraiser but would take the information "into [the court's] weight."

### D. The B&B's Value, Operation, And Alleged Marital Waste

Thomas did not present an expert valuation for the B&B, but he placed the business's value at $431,607.60. Thomas testified that he had never operated the B&B but that he had helped with limited tasks on an "emergency basis." Thomas contended that Cheryl had been the "sole proprietor" and operator of the B&B and that its value should be held against her because she unreasonably depleted a marital asset when she left Sitka.

Cheryl's expert valued the B&B at $224,000, factoring in an $18,000 annual allocation for a third-party manager. Cheryl challenged Thomas's waste theory, stating that she was not motivated by a desire to deprive him of marital property. She

maintained that it had not been her intent to "abandon the business," that she had hoped it "would at least still be running until we decided what was going to happen," but that Thomas had closed it down when she left. Cheryl asked the court to assign Thomas the B&B's $224,000 value.

### E.    Findings Of Fact And Conclusions of Law

In January 2019 the superior court issued its findings of fact and conclusions of law. The court addressed the nine statutory factors for consideration in division of a marital estate.[1]

---

[1]    AS 25.24.160(a)(4) requires dividing assets between the parties to "fairly allocate the economic effect of divorce" and requires considering:

> (A) the length of the marriage and station in life of the parties during the marriage;
>
> (B) the age and health of the parties;
>
> (C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market . . . ;
>
> (D) the financial condition of the parties, including the availability and cost of health insurance;
>
> (E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;
>
> (F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;
>
> (G) the circumstances and necessities of each party;
>
> (H) the time and manner of acquisition of the property in question; and
>
> (I) the income-producing capacity of the property and

(continued...)

The court noted that the parties were married for over 24 years and that Thomas at 56 and Cheryl at 55 were in "overall good health with no special needs." Finding that each was "near the end of their working life," the court placed Thomas's earning capacity at $200,000 annually, but "limit[ed] his work life as a dentist until 60 years of age due to changes in his eyesight, fine motor skills, lower back pain[,] and occasional fainting spells." The court placed Cheryl's earning capacity at $50,000 annually until age 65, noting her office and hospitality service experience. The court characterized their financial condition as "very strong" and noted each had available low-cost health insurance.

Addressing the parties' conduct, including Thomas's alleged marital waste, the superior court stated:

> [Cheryl] argues that she had to leave the home for her safety and that [Thomas] wasted marital income by not continuing to run the [B&B] from their home. These arguments have no support in the evidence. [Cheryl's safety] arguments . . . are speculative at best . . . . The [B&B] was [Cheryl's] business; once she left the home, there was no one who could reasonably manage that business.

The court valued the B&B at zero and did not assign it to either party.

The court awarded Thomas the Sitka residence and awarded Cheryl the Sitka rental. It awarded Cheryl the Ketchikan duplex, using her $385,000 appraisal value. The court unevenly divided the parties' bank accounts and retirement accounts. The court awarded Cheryl 37.64% of Thomas's divisible military retirement pay, or 50% of the marital portion of the divisible retirement pay, i.e., the coverture fraction.[2]

---

[1]    (...continued)
the value of the property at the time of division; . . . .

[2]    *Wiegers v. Richards-Wiegers*, 420 P.3d 1180, 1186 (Alaska 2018) ("We
(continued...)

The court determined that, apart from Thomas's "greater earning potential over the next four years," there was "little reason" to depart from an even division. The court reasoned: "Over the next four years [Thomas] will earn $800,000. Over the next nine years [Cheryl] will earn $450,000. The difference in income over their working lives is $350,000, half of which is $175,000." The court accordingly awarded Cheryl an additional $175,000 to account for the income disparity over their remaining working careers.

The court noted that although it had no "jurisdiction to divide" Thomas's VA disability pay, it could consider the "additional income [Thomas] will enjoy over his lifetime and make other adjustments to ensure a fair and equitable distribution." Projecting that Thomas would receive $1,686.13 monthly over the expected 24 years of his lifetime for a total of $485,605.44 in disability pay, the court awarded Cheryl an additional 37.64% of that total, or $182,781.88. The court explained that adjusting Thomas's income over his remaining career and life span was equitable because Cheryl had "no reasonable ability to earn the additional income she enjoyed during" the marriage.

Thomas sought reconsideration of the approximately 57/43 property division in Cheryl's favor. Among other points, Thomas argued that the court: (1) failed to explain why it adopted Cheryl's appraiser's value for the Ketchikan duplex; (2) misused his VA disability benefits by effectively awarding Cheryl half of a putative marital portion of the non-divisible asset; (3) misused his potential future income to

---

**2**     (...continued)
calculate the marital portion of a benefit using the coverture fraction ... [,] the numerator is 'the number of years worked during the period of coverture' and the denominator is 'the total number of years worked.' " (quoting *Hansen v. Hansen*, 119 P.3d 1005, 1015 (Alaska 2005))).

award Cheryl a greater share of the marital estate when he had expressed his intent to retire; and (4) failed to conclude Cheryl had committed marital waste and consequently assign the B&B's value to her.

The court acknowledged a clerical error in the Ketchikan duplex's value and increased it to $420,000. The court rejected Thomas's marital waste argument, calling the "evidence of unreasonableness insufficient." The court subsequently clarified that an uneven division was justified "due to the disparity in income over the next few years" and the "significant transition in terms of [Cheryl's] financial well-being." The court explained that an additional cash award was "necessary" because for Cheryl to service "two large mortgages" while living on one-quarter of the income previously at her disposal would be "extremely difficult." Clarifying that Thomas "will receive 100% of his disability pay," the court explained that it used "income calculations as a yardstick to help determine what [Cheryl] needs and what [Thomas] can afford." The court also explained that it had "used a very conservative measure" for calculating potential future income and that Thomas "could just as easily move into some other, high-paying management position."

### F. Appeal

Thomas appeals. He argues that the superior court: (1) erred by failing to conclude that Cheryl had unreasonably depleted the B&B marital asset and assigning its value to her; (2) erred when considering and calculating the parties' future earning capacities; and (3) erred by awarding her the equivalent of a marital portion of his disability benefits.

## III. STANDARD OF REVIEW

"The equitable division of marital assets involves three steps: (1) determining what property is available for distribution, (2) finding the value of

the property, and (3) dividing the property equitably."[3]  "The first step, characterizing property . . . , involves mixed questions of law and fact; 'we review the superior court's legal conclusions de novo and its factual findings for clear error.' "[4]  We review the second step, valuation of property, for clear error, and the third step, equitable allocation of property, for abuse of discretion.[5]  "A property division is an abuse of discretion if it is clearly unjust; it will also be set aside if it is based on a clearly erroneous factual finding or mistake of law."[6]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Clearly Err By Determining Cheryl Had Not Unreasonably Depleted A Marital Asset.

"Alaska Statute 25.24.160(4)(E) instructs trial courts to consider the conduct of the parties, including whether there has been unreasonable depletion of marital assets, in dividing marital property."[7]  "The elements of unreasonable depletion [i.e. marital waste] are (1) use of [marital] property for the spouse's own benefit, (2) at

---

[3]      *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014).

[4]      *Wiegers*, 420 P.3d at 1182 (quoting *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015)).  This includes determinations of unreasonable dissipation of marital assets.  *See Stanhope v. Stanhope*, 306 P.3d 1282, 1288 (Alaska 2013) (reviewing for clear error finding that one spouse wasted marital assets); *Elliot v. James*, 977 P.2d 727, 733 (Alaska 1999) (holding "court's finding that neither party unreasonably depleted marital assets [was] not clearly erroneous").

[5]      *Wiegers*, 420 P.3d at 1182.

[6]      *Wagner v. Wagner*, 386 P.3d 1249, 1251 (Alaska 2017); *see also Engstrom*, 350 P.3d at 769 ("An abuse of discretion occurs if the court considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others.").

[7]      *Elliott*, 977 P.2d at 733.

a time when the marriage is breaking down (either before or after separation), [and] (3) with an intent to deprive the other spouse of the other's share of the marital property."[8] "[A]ll three of the identified elements are not necessarily present in every case."[9]

Thomas contends that the superior court erred by failing to determine that Cheryl had unreasonably depleted a marital asset when she left the B&B unattended, and he argues that unreasonable depletion was the logical conclusion flowing from the court's related findings concerning his conduct. He points to the court's finding that when Cheryl left there was "no one who could reasonably manage that business." But that finding related to Cheryl's claim that Thomas had committed marital waste, and it does not require the court to conclude that Cheryl had committed marital waste.

Thomas cites three Alaska cases as support for his argument. In the first, a spouse vandalized marital property;[10] in the second, a spouse sold marital property in violation of a court order and collected rent without paying maintenance costs on marital rental property;[11] and in the third, a spouse failed to make house payments and ultimately

---

**8**     *Id.*; *see also Partridge v. Partridge*, 239 P.3d 680, 686 n.21 (Alaska 2010) ("The term 'depletion' is generally reserved for cases where one spouse used marital property for his or her own benefit with the intent to deprive the other spouse of his or her share of the marital property.").

**9**     *Jones v. Jones*, 942 P.2d 1133, 1140 n.7 (Alaska 1997).

**10**     *Stanhope v. Stanhope*, 306 P.3d 1282, 1288 (Alaska 2013) (affirming court's finding that spouse wasted marital assets by vandalizing home, despite "conflicting oral accounts of the house's condition").

**11**     *See Hockema v. Hockema*, 403 P.3d 1080, 1094 (Alaska 2017) (determining that it was within court's discretion to consider parties' conduct in marital asset allocation).

placed the parties' home in foreclosure.[12]  Thomas also cites other jurisdictions' cases concerning business closures or lost profits.[13]  Given our deference to the superior court's weighing of evidence, these cases are unpersuasive.

Cheryl's leaving the B&B without management does not compare with purposefully vandalizing or selling marital property, collecting rent without maintaining the property, or failing to make mortgage payments.  Even though the superior court was unconvinced by Cheryl's arguments that she left Sitka out of fear for her safety, it still could find insufficient evidence of misconduct amounting to marital waste.  The court may have favorably weighed Cheryl's testimony describing her intended efforts to minimize financial impact.  Alternatively, the court may have credited her testimony about dates the B&B would not have been fully run based on past reservations.  Similarly, the court may have agreed that Thomas could have hired someone to operate the B&B or used the space as a rental property and avoided the depletion.

The superior court did not explicitly discuss the three unreasonable depletion elements, but we analyze those elements and conclude that its determination is merited.  Only one element is clear from the facts:  the conduct in question — Cheryl's leaving Sitka, with no one else being reasonably able to manage the B&B — occurred when the marriage was breaking down.  The record lacks any evidence that Cheryl either used the B&B for her own benefit or derived any tangible, personal benefit by leaving

---

[12]     *Oberhansly v. Oberhansly*, 798 P.2d 883, 885 (Alaska 1990) (upholding uneven property division because, among other reasons, court "properly considered [spouse's] fault in allowing most of the household debts to fall in default and in paying personal debts out of marital assets").

[13]     *Scala v. Scala*, 59 A.D.3d 1042, 1043 (N.Y. App. Div. 2009) (affirming determination that closing masonry business constituted wasteful dissipation of assets); *In re Marriage of Thomas*, 608 N.E.2d 585, 587 (Ill. App. 1993) (upholding ruling that spouse dissipated marital property by causing or allowing marital business devaluation).

it unattended.  Although all three unreasonable depletion elements need not be present, based on the two missing elements the court was entitled to determine there was insufficient evidence of unreasonable depletion.

**B.    It Was An Abuse Of Discretion To Award Cheryl An Additional $175,000 From The Marital Estate Based On The Asserted Differences In The Parties' Future Earning Capacities.**

The superior court considered Thomas's income over both his remaining working career and his expected life span and attempted to calculate "reasonable estimates to capture the additional income [Thomas] will enjoy from which [Cheryl] will not benefit."  The court found that Thomas would earn "approximately $200,000 per year.  The court limits his work life as a dentist until 60 years of age due to changes in his eyesight, fine motor skills, lower back pain[,] and occasional fainting spells. . . . [Cheryl] has no limitations to her ability to work until she is 65 years of age."  It awarded Cheryl an additional $175,000, explaining that the amount represented Thomas's "status and rank earned primarily during the marriage" and that Cheryl had "no reasonable ability to earn the additional income she enjoyed during the 24 years of marriage."

Contending that the superior court erred by awarding Cheryl the additional funds, Thomas makes three arguments relating to his intent to retire, the court's analysis of Cheryl's needs, and the court's mathematical calculations.

**1.    The court did not fail to consider Thomas's expressed intent to retire.**

Thomas first argues that the superior court abused its discretion by failing to account for his intent to retire when it considered the parties' future earning capacities. Thomas maintains that the court "failed to consider the multiple times that [he] had testified that he had already retired once (Nov. 30, 2015), and [that] he wanted to retire permanently."  Thomas emphasizes that he "explained the multiple medical problems that directly affected his ability to do his best work" and "that he wanted to stop working

before he lost his skills." Cheryl notes her contrary testimony that Thomas could work in the future, and she stresses that he "presented no medical evidence, medical records or testimony from any professional to support his claim that he could not continue to work as a dentist or in any capacity in the medical community."

Thomas provided no medical evidence regarding an inability to work, and the testimony presented involves a credibility determination between Thomas and Cheryl. We give "particular deference to the trial court's factual findings when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence."[14] Absent "definite support" for a party's claims of medical inability to work, a court is entitled to disbelieve testimony standing alone, particularly if it conflicts with testimony from the opposing party.[15] And, contrary to Thomas's contention, the court's written finding "limit[ing] his work life as a dentist until 60 years of age due to changes in his eyesight, fine motor skills, lower back pain, and occasional fainting spells" reflects that it considered his testimony concerning his health conditions. Given the lack of support for Thomas's medical inability to continue working until age 60 and the court's apparent consideration of his alleged intent, we see no error.

### 2. The court adequately analyzed Cheryl's needs.

Thomas next challenges the superior court's alleged "failure to do any analysis" of Cheryl's needs. Arguing that "the trial court is required . . . to make detailed

---

[14] *Millette v. Millette*, 177 P.3d 258, 261 (Alaska 2018) (quoting *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005)), *overruled on other grounds by Geldermann v. Geldermann*, 428 P.3d 477, 487 n.52 (Alaska 2018).

[15] *See Sloane v. Sloane*, 18 P.3d 60, 66 (Alaska 2001) (rejecting appeal argument based upon alleged failure to consider medical concerns affecting ability to work when no evidence had "conclusively state[d] the consequences of . . . ongoing health concerns" or clearly stated claimed need for several surgeries).

findings as to what the financially disadvantaged spouse's needs are"[16] he identifies the factor requiring the court to consider "the circumstances and necessities of each party," codified at AS 25.24.160(a)(4)(G). But the court sufficiently considered Cheryl's needs, particularly the "period of significant transition in terms of her financial well-being" when she will be servicing "two large mortgages" on a quarter of the income amount Thomas will have. The court clearly was concerned about the parties' significant income disparity and the debt associated with the properties awarded to Cheryl, and its findings are sufficient to show that the court considered the issue.

> **3.    Calculations to adjust the marital estate in Cheryl's favor were clearly erroneous, but the court did not abuse its discretion by refusing to reduce the award to present value.**

Thomas alternatively challenges the court's mathematical calculations, raising three alleged mistakes: (1) his actual remaining work life until he turns 60 was 38 months, not 48 months, decreasing the calculation for his gross earnings from $800,000.00 to $633,333.33; (2) not accounting for the income tax obligations on his $200,000.00 annual wages over 38 months and for Cheryl's projected income tax obligation; and (3) not reducing to present value the amount awarded to Cheryl based on the difference in their future earning capacities.

The superior court generally couched its decision in terms of its discretion to make an uneven division based on the parties' "disparity in income over the next few years." We see no error in the court's conceptualization of the issue. But at least two errors affect the division's fairness. First, the ten-month difference in Thomas's remaining working career makes a significant difference in calculating his relevant future earning capacity. Cheryl provided no concrete response refuting this alleged error, and we believe the court should make an adjustment for accuracy. Second, the court should

---

[16]    *Hockema*, 403 P.3d at 1088-89.

have considered tax consequences or at least provided a pertinent explanation why doing so was unnecessary. We have held that a court should consider "the immediate and specific tax consequences of its division of property" if a party has advocated for how "the tax code and regulations apply to the disposition of property so that the court can make a reasoned decision."[17] The court's future earnings calculations and comparison had not been part of the parties' trial presentations, and Thomas had no opportunity — other than his unsuccessful reconsideration motion — to raise the tax issue.

The third error Thomas alleges is that the superior court abused its discretion by not reducing to present value the award based on the difference in future earning capacities. He cites only a military retirement and divorce treatise discussing the importance of assigning a fixed value to a defined benefit plan. But Thomas's argument, based on earning capacity in his remaining working career and not on a defined benefit plan, is unpersuasive; we thus reject this alleged error.

### 4. Summary of our conclusions about the court's future earning capacities decisions.

The superior court did not fail to consider Thomas's intent to retire or Cheryl's financial needs, and it was not required to reduce its award to present value. But we remand for the court to adjust its calculations to account for the ten-month difference in Thomas's remaining working career and to consider the tax consequences.

### C. Awarding Cheryl The Equivalent Of Half Of A Putative Marital Portion Of Thomas's VA Disability Benefits Was Improper.

Thomas argues that awarding Cheryl the equivalent of half of a marital portion of his VA disability pay is prohibited. Cheryl maintains that it was in the superior court's broad discretion to divide the marital estate in her favor "due to the vast difference" between her $50,000 and Thomas's $200,000 future earning capacities. The

---

[17] *Oberhansly*, 798 P.2d at 887.

court acknowledged that it lacked jurisdiction to divide Thomas's VA disability pay but explained that it could "consider the additional income [Thomas] will enjoy over his lifetime and make other adjustments to ensure a fair and equitable distribution of the property." The court calculated that Thomas would receive $1,686.13 in monthly disability pay for 24 years, totaling $485,605.44; the court then calculated 37.64% of that total — the coverture fraction the court had calculated for Thomas's federal retirement — and awarded Cheryl an additional $182,781.88. After Thomas challenged the court's award as a division of his VA disability benefits, the court clarified that he would receive 100% of his VA disability pay but that the court had used the "income calculations as a yardstick to help determine what [Cheryl] needs and what [Thomas] can afford."

In *Guerrero v. Guerrero* we explained marital division of military retirement pay and disability benefits.[18] Relevant to this appeal, VA disability pay is "a function of the member's VA disability rating and the member's number and type of dependents."[19] "Historically a member's receipt of VA disability payments was contingent on the member waiving an equal amount of retired pay."[20] But in 2004 Congress "modif[ied] the VA waiver requirement and its consequences" by providing for "concurrent receipt" of retired pay and disability benefits "for certain classes of eligible retirees."[21]

One program is concurrent retirement and disability pay (CRDP), "a phase-in program allowing qualifying disabled veterans to receive VA disability pay

---

[18]    362 P.3d 432, 438-41 (Alaska 2015).

[19]    *Id.* at 439.

[20]    *Id.*

[21]    2 MARK E. SULLIVAN, THE MILITARY DIVORCE HANDBOOK: A PRACTICAL GUIDE TO REPRESENTING MILITARY PERSONNEL AND THEIR FAMILIES 673 (3d ed. 2019).

while waiving incrementally smaller amounts of retirement pay and providing for receipt of full retirement for all qualified disabled veterans pay by 2014."[22] CRDP "ameliorat[es] the unfairness of unilateral changes in military pension division orders by retirees who, after the fact, obtain VA disability compensation and thus reduce the share of the former spouse."[23] Thomas emphasizes that he "receives VA disability compensation concurrently with his full disposable retired pay" and that Cheryl thus "has not 'lost' any part of her portion of [his federal] retirement."

### 1. Preemption of the VA disability benefits division

Under the Uniformed Services Former Spouses Protection Act (USFSPA) "state courts 'may treat disposable retired pay payable to a member . . . either as property solely of the member or as property of the member and [the member's] spouse in accordance with the law of the jurisdiction.' "[24] But VA disability "is not subject to property division because it is excluded from the definition of disposable retired pay under USFSPA."[25] In *Mansell v. Mansell* the U.S. Supreme Court held that USFSPA "does not grant state courts the power to treat as property divisible upon divorce military retirement pay that has been waived to receive veterans' disability benefits."[26]

Following *Mansell*, in *Clauson v. Clauson* we held that state courts do not have the power to "equitably divide veterans' disability benefits received in place of

---

[22]  *Guerrero*, 362 P.3d at 439.

[23]  SULLIVAN, *supra* note 21, at 674.

[24]  *Guerrero*, 362 P.3d at 440 (quoting 10 U.S.C. § 1408(c)(1) (emphasis omitted)).

[25]  SULLIVAN, *supra* note 21, at 671 (citing 10 U.S.C. § 1408(a)(4)(A)(ii)).

[26]  490 U.S. 581, 594-95 (1989).

waived retirement pay."[27] In that case a husband waived his military pension to collect disability benefits, effectively ending his former wife's share of his pension amounting to $168 monthly.[28] In response the superior court entered an order requiring the husband to pay his former wife an amount replacing her share of his waived military retirement pay.[29] We vacated the modification order because it had the effect of dividing disability benefits.[30] We explained that USFSPA "prohibits" state courts "from distributing this type of military benefit to a former spouse when allocating property upon divorce."[31] We also considered the separate but related question whether federal law precludes state courts from "considering the economic impact that a waiver of military retirement pay and corresponding receipt of disability pay has on the parties to a divorce."[32] We held that when equitably allocating property upon divorce, federal law does not preclude state courts "from considering . . . the economic consequences of a decision to waive retirement pay in order to collect disability pay."[33] But we explained that "courts should only consider a party's military disability benefits as they affect the financial circumstances of both parties."[34]

---

[27] 831 P.2d 1257, 1262 (Alaska 1992).

[28] *Id.* at 1258.

[29] *Id.* at 1259.

[30] *Id.* at 1264 ("Disability benefits should not, either in form or substance, be treated as marital property subject to division upon the dissolution of marriage.").

[31] *Id.* at 1262.

[32] *Id.*

[33] *Id.* at 1264.

[34] *Id.*

More recently, in *Howell v. Howell* the U.S. Supreme Court applied *Mansell* to reverse a ruling impermissibly treating waived military retirement pay as divisible property.[35] In *Howell* the original divorce decree awarded the veteran's spouse 50% of the veteran's total retirement pay; 13 years later the veteran waived a share of the retirement pay to receive disability benefits, thereby reducing the former spouse's share.[36] The Arizona family court ordered the veteran to indemnify the former spouse for the loss caused by the waiver of retirement benefits, and the Arizona Supreme Court affirmed.[37] The Supreme Court rejected this attempt to qualify the order dividing property as a "reimbursement" or "indemnification," noting that the decision rested entirely on restoring the portion lost from the waiver.[38] The court thus held that federal law preempts state courts from ordering indemnification for the loss caused by the veteran's waiver of retirement pay to receive disability benefits where "the amount [awarded to the spouse] mirrors the waived retirement pay, dollar for dollar."[39]

Cheryl argues that *Mansell*, *Howell*, and *Clauson* are distinguishable from this case because they "concern a spouse who waived military retired pay in order to receive disability pay." Although acknowledging this difference, Thomas argues that when combined with two other Alaska cases discussed below, *Clauson* provides the

---

[35]     137 S. Ct. 1400, 1405 (2017).

[36]     *Id.* at 1404.

[37]     *Id.*

[38]     *Id.* at 1406.

[39]     *Id.*; *see also* SULLIVAN, *supra* note 21, at 681 ("In effect, [*Howell*] sounded the death knell for courts (when . . . express contractual indemnification or res judicata is not present) requiring reimbursement for former spouses whose share or amount of military retired pay has been decreased due to election of a VA waiver." (Emphasis omitted)).

relevant holding: "[T]rial courts cannot assign a value to . . . non-divisible disability benefits and award a marital fraction of that value to the nonmilitary or nondisabled spouse from marital property." Cheryl's proposed factual distinction is not material. Whether the disability pay is received concurrently or through waiver, *Howell* preempts dividing military disability pay in either form or effect, particularly with a "dollar for dollar" offset.[40]

### 2. Considering VA disability benefits in equitable division

*Howell* preempts the division of VA disability pay, but the question of permissibly considering such benefits in an equitable division analysis remains. Our decisions in *Guerrero*[41] and *Dunmore v. Dunmore*[42] establish guidelines for the analysis.

In *Guerrero* a couple agreed that the husband would allocate half of his military retirement benefits to his wife, but the superior court concluded that none of the husband's military benefits were disposable retired pay.[43] The wife challenged that

---

[40]     *Howell*, 137 S. Ct. at 1406; *see also In re Marriage of Kraft*, 832 P.2d 871, 875-76 (Wa. 1992) (holding that under *Mansell* courts cannot "reduce military disability pay to present value where the purpose of ascertaining present value is to serve as a basis to award the nonretiree spouse a proportionately greater share of the community property as a direct offset of assets"); SULLIVAN, *supra* note 21, at 707 ("A dollar-for-dollar setoff of marital . . . property against the present value of the disability award is not allowed because it would be a violation of the Supremacy Clause as an impermissible infringement on the exclusion of VA disability pay from pension division set out in [USFSPA]. If the court simply does indirectly what it is barred from doing directly, the actions of the trial court may not stand up to appellate scrutiny.").

[41]     362 P.3d 432 (Alaska 2015).

[42]     420 P.3d 1187 (Alaska 2018).

[43]     362 P.3d at 434, 437, 442.

determination, arguing in part that the CRDP the husband received was divisible.[44] But we rejected that argument, clarifying: "CRDP does not change the nature of [the husband]'s Chapter 61 retirement benefit. [His] benefits come from two sources — Chapter 61 disability retirement and VA disability payments. Neither source is divisible upon divorce."[45] Still, we determined that it was "an abuse of discretion to refuse to reopen the property settlement agreement and conduct a full equitable division analysis."[46] We remanded, noting that the parties' "financial conditions," including receipt of military disability retirement benefits, "must be considered when equitably dividing the marital estate and when deciding whether to require alimony"; but we also cautioned against "simply shift[ing] an amount of property equivalent to the . . . retirement pay from the military spouse's side of the ledger to the other spouse's side."[47]

In *Dunmore* we considered the relevance of Social Security benefits in the marital property division; like VA disability payments, Social Security benefits are precluded from division in divorce proceedings.[48] After the superior court "declined to consider how the couple's Social Security benefits affected a fair distribution" of their marital property,[49] we agreed that "courts may not evade the federal prohibition [on dividing Social Security benefits] by offsetting the Social Security benefits with a larger

---

[44]     *Id.* at 441.

[45]     *Id.*

[46]     *Id.* at 445.

[47]     *Id.* (quoting *Clauson v. Clauson*, 831 P.2d 1257, 1264 (Alaska 1992)).

[48]     420 P.3d 1187, 1191 (Alaska 2018).

[49]     *Id.* at 1189.

award of marital property to the other spouse."[50]  But we also clarified that courts may consider the parties' Social Security benefits as financial condition evidence for the marital property division.[51]  We analogized this approach to VA disability benefits, as "retirement assets that by federal law cannot be divided."[52]  Reiterating our *Guerrero* holding, we cautioned against shifting property to "directly offset nondivisible disability pay" but directed courts to consider the parties' "financial conditions," including "military disability retirement benefits," when equitably dividing the marital estate.[53]

The key inquiry in this case is whether the superior court properly limited its consideration of Thomas's VA disability benefits "as they affect the financial circumstances of both parties"[54] without shifting property to "directly offset nondivisible disability pay."[55]  Cheryl argues that the court properly considered Thomas's future income streams to equitably divide the marital estate and considered his future disability benefits only to determine her needs and what Thomas could afford.  Cheryl emphasizes, and Thomas acknowledges, *Guerrero*'s holding that the parties' financial conditions, including disability retirement benefits, must be considered in an equitable division.

Thomas contends that *Guerrero*'s holding should be limited to similar situations in which military retirement pay "was the parties' principal asset"; he points out that in *Guerrero* the husband received over $9,000 monthly in disability pay, and the

---

[50]     *Id.* at 1191.

[51]     *Id.* at 1190-93.

[52]     *Id.* at 1193.

[53]     *Id.* (quoting *Guerrero v. Guerrero*, 362 P.3d 432, 441, 445 (Alaska 2015)).

[54]     *Clauson v. Clauson*, 831 P.2d 1257, 1264 (Alaska 1992).

[55]     *Dunmore*, 420 P.3d at 1193.

wife received nothing.[56] Thomas argues that in contrast his disability pay "is a small proportion of his overall income," only "18% of his total pension income[] and only 6% of his . . . income when his pension is added to earnings of $200,000/year," and that Cheryl still would receive "over $2,400/month from [his] military pension." Thomas also reiterates the additional assets Cheryl received in the division, emphasizing that the "facts in *Guerrero* are a far cry from the facts in this case." Although this may be a notable factual distinction in terms of the division as a whole, it is not a convincing argument for holding that the consideration of financial circumstances is constrained to contexts in which the parties' primary asset is not divisible.

### 3. The superior court's equitable division

The superior court considered Thomas's income over his remaining working career and his expected life span and attempted "reasonable estimates to capture the additional income [Thomas] will enjoy from which [Cheryl] will not benefit." Explaining that this "additional income represents his increased status and rank earned primarily during the marriage," the court noted that she had "no reasonable ability to earn the additional income she enjoyed during the 24 years of marriage." Under the legal framework outlined above, the court began with a sound approach when it "consider[ed] the additional income [Thomas] will enjoy over his lifetime," then attempted to "make other adjustments to ensure a fair and equitable distribution of the property." The court emphasized Cheryl's significant financial transition.

We disagree with Thomas's contention that VA disability payments have no bearing on an equitable division of marital property. We also are satisfied by the superior court's reasoning that Cheryl's "period of significant transition in terms of her financial well-being" justifies a "necessary" additional award "for her support to

---

[56] 362 P.3d at 441, 445.

-23- 7504

transition from married to single" and being awarded two properties with large associated debt. This justifies an unequal distribution based upon Thomas's expected future working income compared to Cheryl's, as discussed previously.

But the superior court's explanation does not cure the legal defect surrounding its specific treatment of Thomas's VA disability benefits, and neither does the court's later explanation of its "inartful order." The court referred to its use of the income calculations as a "yardstick," but by directly offsetting nondivisible disability pay "to the dollar and to the penny," the figure was clearly applied as a dollar for dollar distribution prohibited by *Howell*.[57] When determining an equitable division, courts should avoid using figures equivalent to property that is not divisible, such as VA disability payments or Social Security benefits. Although these benefits may properly be considered in assessing a party's financial condition as a whole, dollar for dollar or any equivalent distribution is preempted by federal law.[58]

We therefore reverse the superior court's $182,781.88 award to Cheryl from the marital estate that is the cash equivalent of a coverture fraction of a putative marital portion of Thomas's lifetime future VA disability benefits, and we remand the issue for renewed consideration.

## V.    CONCLUSION

We AFFIRM the superior court's decision rejecting Thomas's marital waste theory. But we VACATE the property division and REMAND for the court to reconsider its methodology for awarding Cheryl a portion of the marital estate compensating for future income disparity.

---

[57]    *Howell v. Howell*, 137 S. Ct. 1400, 1406 (2017) (preempting any situation in which "the amount [awarded to the spouse] mirrors the waived retirement pay, dollar for dollar").

[58]    *Id.*