**Karl HANSEN, Appellant,**

v.

**Mada HANSEN, Appellee.**

**No. S–11053.**

Supreme Court of Alaska.

Sept. 2, 2005.

---

9. 662 P.2d 109 (Alaska 1983).

G.R. Eschbacher, Anchorage, for Appellant.

Lawrence A. Pederson, Paul J. Nangle & Associates, Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

Karl and Mada Hansen divorced in 2002, and the superior court divided their assets following trial. Karl raises various property division issues on appeal. We affirm as to most of the rulings challenged by Karl. But we reverse the ruling that one of Karl's IRAs was a wholly marital asset, because we conclude that Karl funded at least part of this account with premarital assets. We also reverse the ruling that Karl's T. Rowe Price account was a marital asset, because we conclude that Karl funded this account with premarital assets. And we vacate the ruling that all of Mada's post-retirement health insurance benefits are her separate property, because we conclude that she used marital assets to repurchase benefits she earned before the marriage and that they have value to Mada. We remand for further proceedings as to the IRA, the T. Rowe Price account, and the health insurance benefits. We affirm the property division order in all other respects.

## II. FACTS AND PROCEEDINGS

Mada and Karl Hansen began living together in 1986 and married in June 1989. Mada filed a complaint for divorce on July 24, 2000. Throughout the divorce proceedings they lived in separate areas of the marital home until Karl moved out on October 10, 2002. They both paid bills associated with the home. The superior court found that "even though [Mada and Karl] were heading toward divorce, they continued, for all practical purposes, to live as a marital unit." The superior court issued the divorce decree on October 22, 2002.

No children were born or adopted of the marriage, and Karl and Mada are both in relatively good health and capable of working. Karl is a self-employed civil engineer with Cold Regions Technology, Inc. (Cold Regions) and is its sole shareholder. He has earned, and continues to earn, more than Mada, reporting income of $93,000 on his 2000 tax return. He also has a longer work-life expectancy because he is seven years younger than she is. Mada is an engineer technician at the Municipality of Anchorage and earns $34,344 per year.

The superior court's October 2002 findings of fact and conclusions of law entered following trial found that

> Karl managed all the finances. Sometimes he transferred money from accounts in their individual names to accounts in only Karl's name. It is difficult to trace all the money. It is clear from the way the money was transferred and used that it was commingled and that some of it was used to improve the marital home.... I find that Karl's financial transfers during the marriage do not make sense and raise some questions about the use of the funds and the source of some of the money in accounts he does not satisfactorily explain.

The court also stated that "[i]t is difficult to determine if there has been an unreasonable depletion of the marital assets. It appears that Karl may have made some poor decisions about the amount of money he borrowed and spent on remodeling the house." The court found that "the parties' funds were commingled and transmuted into marital property." For these reasons and because of

their disparate earning potentials, the court decided that "a 60/40 distribution in Mada's favor is just." The court classified and divided the parties' property.

Karl unsuccessfully moved for reconsideration. Karl appeals with respect to rulings regarding the following assets: (1) Cold Regions; (2) the marital residence; (3) post-separation payments; (4) the Alaska USA account; (5) two IRA accounts; (6) the T. Rowe Price account; and (7) Mada's health insurance benefits.

## III. DISCUSSION

### A. Standard of Review

■ In property division cases we determine whether the trial court abused the discretion vested in it under AS 25.24.160(a)(4).[1] Dividing the property is a three-step process.[2] First, the trial court must determine what property is available for distribution, characterizing the property as either separate or marital, a determination we review under the abuse of discretion standard. An abuse of discretion occurs if the court considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others.[3] Marital property includes all property acquired during the marriage "excepting only inherited property and property acquired with separate property which is kept as separate property."[4] We apply our independent judgment to any questions of law.[5]

Second, the trial court must place a value on the property, a ruling which is a factual determination reviewed for clear error.[6] To reverse for clear error, we must be left with a definite and firm conviction on the entire record that a mistake has been made.[7]

Third, the trial court must equitably allocate the property, a ruling which we review under the abuse of discretion standard; we

will not disturb the allocation unless it is clearly unjust.[8]

■ The trial court has broad discretion in considering the following factors, among others, in allocating marital property: (1) the parties' earning abilities; (2) the parties' stations in life; (3) the parties' circumstances and necessities; (4) the parties' physical conditions and health; and (5) the parties' financial circumstances, including the time and manner of acquisition of the property at issue, its value at the time, and any income producing capacity.[9]

### B. The Court Did Not Clearly Err in Valuing Cold Regions.

■ Mada's expert, Francis Gallela, and Karl's expert, Ted Sherwin, testified regarding the value of Cold Regions. The superior court found Gallela's testimony more persuasive and valued Cold Regions at $96,236.

Karl argues that the superior court erred, because it did not give a sufficient explanation for its finding. He argues that because Cold Regions is primarily a one-person corporation, the value of its goodwill plays a significant role in its value. He contends that Gallela was unable to separate Karl's goodwill from Cold Regions's goodwill and was unable to determine Cold Regions's marketability. Therefore, he argues, Gallela's "estimate of value is of little practical use."

Karl argues that Sherwin, a certified public accountant, considered Cold Regions's marketability and goodwill. Sherwin found an absence of marketable goodwill; Karl argues that the goodwill was his own and is therefore not marketable. He contends that the court erroneously made no finding whether goodwill existed and whether it could be sold to a prospective buyer. Karl argues that Sherwin conducted a more thorough investigation than Gallela and conclud-

1. *Moffitt v. Moffitt (Moffitt I)*, 749 P.2d 343, 346 (Alaska 1988).

2. *Id.*

3. *West v. West*, 21 P.3d 838, 841 (Alaska 2001).

4. *Lewis. v. Lewis*, 785 P.2d 550, 558 (Alaska 1990).

5. *Id.*

6. *Moffitt I*, 749 P.2d at 346.

7. *Martens v. Metzgar*, 591 P.2d 541, 544 (Alaska 1979).

8. *Moffitt I*, 749 P.2d at 346.

9. *Miles v. Miles*, 816 P.2d 129, 131 (Alaska 1991).

ed that the corporation was "going down hill fast" and was worth $36,000. Karl argues that Sherwin's determination of Karl's salary was more accurate than Gallela's and that Gallela's capitalization-of-earnings method was flawed.

Mada points out that Gallela used a capitalization-of-earnings approach to value the business, while Sherwin used an asset-based approach. Mada points out that the business had several employees and a contract worth $272,000, as well as "fairly good prospects" for more work; thus, Sherwin's conclusion that "Karl was the company" was erroneous. Mada argues that the business had goodwill and that it was marketable.

 Valuing goodwill is a two-step process.[10] First, the trial court must decide whether goodwill exists.[11] If goodwill does exist, the court must then determine whether it could be sold to a prospective buyer.[12] If the goodwill is not marketable, then no value for goodwill should be considered in dividing the marital assets.[13] Second, if there is marketable goodwill, the court should determine its value using one or more of the "principled methods of valuation." [14] The capitalization-of-earnings approach Gallela used is an acceptable method.[15] The existence, marketability, and calculation of goodwill present questions of fact, which we will set aside only for clear error.[16]

The superior court picked a value that Gallela determined using an acceptable method, and Gallela's testimony does not clearly state that any of the value he found is goodwill. The superior court could have been clearer in explaining how it arrived at the value it adopted. In *Lang v. Lang* we re-

manded a property division case to the trial court, but there the trial court "failed to make any findings regarding the value of the property distributed." [17] Despite the lack of specific findings in this case, the record, particularly in light of the superior court's conclusion concerning the credibility of the expert witnesses, when viewed as a whole does not leave us with a definite and firm conviction that the superior court made a mistake. We cannot say that the court's decision regarding the value of Cold Regions was clearly erroneous.[18]

## C. The Court Did Not Clearly Err in Valuing the Marital Residence.

 The superior court found that $365,000 was the "as-is" value of the house, including all the uninstalled items and building materials. Karl argues that the court "offered no facts from which it arrived at this figure." He contends that an expert valued the house at $365,000 and the uninstalled building materials inside the house at $22,000. He argues that the court did not address the value of the uninstalled items.

But, as Mada points out, her appraiser valued the house at $340,000, including the unincorporated materials. She also correctly asserts that Karl's appraiser stated that $25,000 was a valid price range divergence. The court, therefore, could have arrived at its valuation of $365,000 in several ways, namely, by using Mada's appraiser's opinion and adding the price range, or by taking Karl's appraiser's finished value ($515,000) and subtracting the cost of completion ($150,-000). She argues that the court's finding is,

---

**10.** *Moffitt I*, 749 P.2d at 347.

**11.** *Id.*

**12.** *Id.; see also Manelick v. Manelick*, 59 P.3d 259, 262–63 (Alaska 2002).

**13.** *Moffitt I*, 749 P.2d at 348.

**14.** *Id.* at 347–48.

**15.** *Pattee v. Pattee*, 744 P.2d 658, 661 (Alaska 1987), *overruled on other grounds by Nass v. Seaton*, 904 P.2d 412, 416 n. 7 (Alaska 1995).

**16.** *See Moffitt v. Moffitt* (*Moffitt II*), 813 P.2d 674, 676 (Alaska 1991); *Manelick*, 59 P.3d at 263–64. We disapprove of *Richmond v. Rich-*

*mond*, 779 P.2d 1211, 1213 (Alaska 1989), to the extent it is inconsistent with reviewing for clear error.

**17.** *Lang v. Lang*, 741 P.2d 1193, 1196 (Alaska 1987).

**18.** *Rausch v. Devine*, 80 P.3d 733, 737 (Alaska 2003) ("The trial court's findings regarding the credibility of witnesses and weighing of the evidence may be reversed only if clearly erroneous. In reviewing the trial court's factual findings, we view the evidence in the light most favorable to the party prevailing in the trial court.") (internal citations omitted).

therefore, not erroneous, and falls within the range of evidence presented at trial.[19] We agree. The superior court valued the house within the range of figures given by the experts.[20] It did not clearly err in choosing this value.

### D. The Court Did Not Abuse Its Discretion in Refusing To Credit Karl for Post–Separation Payments.

The superior court found that both parties made substantial post-separation payments to preserve marital assets, with Karl paying approximately twice as much as Mada. Recognizing that Karl earns significantly more than Mada and that the parties continued to live in the marital home, the court decided not to give either party credit for these payments. The court also took these payments into account "in determining the appropriate overall division of the marital property."

Karl argues that the court erred in refusing either to grant credit to him or to reduce his marital debt accordingly for the $59,889.07 in post-separation payments he made to preserve martial assets. Karl points out that the parties lived in separate areas of the home until he moved out on October 10, 2002. He argues that the court incorrectly decided that (1) the parties remained a marital enterprise until entry of the October 22, 2002 divorce decree and (2) everything that Mada and Karl had earned until then was marital property. He contends that in *Ramsey v. Ramsey* we stated that a trial court may not conclude that parties continue to function economically as a marital unit after the date of separation just because one of the parties is economically dependent on the other.[21] Karl argues that his presence in the marital residence, without more, does not justify declaring all payments marital proper-

ty and denying credit to the payer. He contends that the filing of a divorce complaint and an answer, as well as physical separation to distinct areas of the home, should be enough to declare an end to the marital unit. Karl also points out that he was absent from the parties' home more than he was there.

No single rule defines when a couple ceases to be one economic unit. "Each case must be judged on its facts to determine when the marriage has terminated as a joint enterprise."[22] Generally, "property accumulated with income earned after a final separation that is intended to, and does in fact, lead to a divorce is excluded from the category of marital property, as long as it is obtained without the invasion of any pre-separation marital asset."[23] Likewise, the date for marking the termination point for including property in the marital assets should correspond to the "end of the marital *team* effort."[24] For example, this could be when the parties separate, when one files for divorce, or when the court enters the divorce decree.[25]

Trial courts must "consider payments made to maintain marital property from post-separation income when dividing marital property."[26] But they need not necessarily give credit in the final property division to the spouse making the payment.[27]

The parties here lived in separate parts of the same house and shared house expenses. Thus, we agree with Mada that the superior court could permissibly find that the parties continued to live as a marital unit until the date of the divorce decree. Case law does not require the trial court to credit either party for their post-separation payments,[28] and the court gave clear reasons for its deci-

---

19. *Harrower v. Harrower*, 71 P.3d 854, 862 (Alaska 2003).

20. *Berg v. Berg*, 983 P.2d 1244, 1249 (Alaska 1999).

21. *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992).

22. *Bays v. Bays*, 807 P.2d 482, 486 (Alaska 1991) (quoting *Schanck v. Schanck*, 717 P.2d 1, 3 (Alaska 1986)).

23. *Schanck*, 717 P.2d at 3.

24. *Ogard v. Ogard*, 808 P.2d 815, 819 (Alaska 1991) (original emphasis).

25. *Schanck*, 717 P.2d at 3 & n. 7.

26. *Ramsey*, 834 P.2d at 809.

27. *Id.*

28. *Id.*

sion. We therefore conclude that the court did not abuse its discretion in declining to credit Karl for these payments.

### E. The T. Rowe Price Account and One of the IRA Accounts Are Not Marital Property, but the Other Accounts Are.

Karl argues that the superior court erred by failing to find that three financial accounts were his separate property. Mada argues that the court correctly determined that these accounts were marital.

#### 1. Alaska USA account

■ Karl had an Alaska USA account, and the superior court found that two deposits had been made into it, $8,000 on May 19, 2001 and $6,000 on August 4, 2001. It concluded that because the parties agreed to value marital assets as of the date of the trial and because they continued to live in the marital home and made payments to preserve marital assets, the money then in the Alaska USA account was a marital asset. It also found that "the time of the divorce decree, October 22, 2002, is the time when the income earned after the final separation became severable from marital property." It reached this decision because the financial transactions Karl conducted "and the source of funds in several accounts made it difficult to identify the source of many of the funds."

Karl argues that it was an abuse of discretion for the court to conclude that monies earned and deposited in Karl's account after Mada filed for divorce are marital property, because no evidence shows that the parties intended to function as a marital enterprise after that time. He contends that it is not enough that he and Mada continued to occupy the marital residence; without more this is not evidence of a marital enterprise.

But, as explained above in Part III.D, the court did not err in finding that the parties lived as a marital unit until entry of the divorce decree. As Mada argues, the court determined that the two deposits were mari-

tal property, because it found that the parties continued to function as a marital unit.[29]

The court therefore did not abuse its discretion in characterizing the deposits made before entry of the divorce decree as marital assets.[30]

#### 2. IRAs

■ Karl acquired several IRAs during the marriage. As to two of these accounts, the superior court found that as of September 30, 2001 IRA A had a value of $6,981.04 and IRA B had a value of $41,830.91.[31] It found that these IRAs were rolled over on August 13, 1991 and May 23, 2000, respectively, and held them to be marital assets. It found that "the asset balance was rolled over during the marriage" and found that "the constant re-characterization (by rolling over and/or redepositing into different accounts) of the separate funds and income of both parties" supported characterizing these assets as marital.

Karl contends that he and Mada had separate IRA accounts, although Karl's were rolled over after they married. He claims that during the marriage the parties contributed $3,500 to Karl's IRA and $3,500 to Mada's IRA. Karl asserts that the court erred when it classified these two IRAs as marital, because all funds within these IRAs other than the $3,500 deposits were either premarital or accruals attributable to premarital funds. He argues that the court could not divide this property without finding that the assets were co-mingled or transmuted or that a balancing of the equities requires such a result,[32] yet it made no such findings.

Mada points out that Karl testified that IRA A received some contributions during the marriage. Karl stated that these were rollovers from his other premarital IRAs, but Mada showed that between $67,000 and $121,000 of Karl's marital earnings had not been deposited into marital funds or tracka-

---

**29.** *Schanck,* 717 P.2d at 3 & n. 7.

**30.** *See Lundquist v. Lundquist,* 923 P.2d 42, 47 (Alaska 1996).

**31.** For ease of discussion and to avoid disclosing personal information, we refer to the two disputed IRAs as "IRA A" and "IRA B."

**32.** AS 25.24.160(a)(4); *Green v. Green,* 29 P.3d 854, 857–58 (Alaska 2001).

ble separate funds. Mada argues that the court could infer that the "missing funds," not premarital funds, were the source of the deposits made during the marriage.

 Property that was once separate may be transmuted into marital property if its owner intended to do so. Intent may be demonstrated through words and actions.[33] "[P]lacing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital."[34] We review a finding of transmutation for clear error.[35]

As the superior court explained, it concluded that these IRAs became marital property as a result of Karl's rolling over and redepositing funds. Although it did not specifically mention transmutation in reference to these accounts, the court did find that the parties' funds in general were commingled and transmuted into marital property. The court did not discuss specifically how these rollovers and redeposits demonstrated an intent to transmute separate property into a marital asset.

There is no evidence any funds deposited in IRA A were marital, other than the $3,500 Karl concedes he deposited during the marriage. There was no evidence of transmutation, and we agree with Karl that it was an abuse of discretion to treat the entire account as marital. We therefore reverse the characterization that this account was entirely marital and remand for determination of the value of the $3,500 and the interest it accrued; this portion of the account is marital property. The rest of IRA A is nonmarital property.

We need not remand with regard to Mada's Alaska USA IRA, with a value of $2,287.45. Because Mada contributed $3,500 to this account, the entire IRA is marital property, as the superior court correctly found.

Karl argues that IRA B, like his other IRA, is "separate [personal] property." There was no evidence, either by testimony or exhibit, that IRA B was premarital property. We therefore agree with Mada that the superior court did not abuse its discretion in treating this account as marital.

### 3. T. Rowe Price account

 Karl had a T. Rowe Price account with a value of $30,179 as of September 30, 2001. The superior court found that although this account may have been premarital, it lost that characterization when Karl applied the cash in the account toward the marital residence.

Karl argues that because he funded this account with premarital earnings, the court erroneously characterized it as marital. He also contends that the court erroneously relied on an account balance statement dated September 2001, when the parties were cohabiting, but had filed for divorce. He argues that if the court intended to invade Karl's property to balance the equities, it did not state this intention.[36]

Mada points out that this account contained $13,564 in 1990 and $38,268 at the beginning of 2001. She argues that there was no explanation for the increase in value and that it was Karl's burden to explain this increase.[37] Mada argues that she had shown that a large amount of money Karl received during the marriage had not been deposited into the parties' account; therefore, the court could infer that Karl contributed marital funds to this account. This, she claims, would justify finding that the account was marital due to active appreciation. She also argues that Karl used half of the funds in this account for a marital purpose, to renovate the house, transmuting the account into a marital asset.

---

33. *Green*, 29 P.3d at 857.

34. *Chotiner v. Chotiner*, 829 P.2d 829, 833 (Alaska 1992).

35. *Green*, 29 P.3d at 859.

36. *See Nicholson v. Wolfe*, 974 P.2d 417, 424 & n. 26 (Alaska 1999) (noting that without finding

that parties intended to treat premarital property as marital property, "the trial court would be justified in dividing the ... assets only if it specifically found that a balancing of the equities between the parties required invasion of the premarital holding") (internal quotation omitted).

37. *Harrower v. Harrower*, 71 P.3d 854, 859 (Alaska 2003).

■ Separate property may become marital through either transmutation, as described above, or active appreciation, which occurs

> when marital funds or marital efforts cause a spouse's separate property to increase in value during the marriage. In contrast to transmutation, which converts an asset completely from separate to marital, active appreciation recognizes that a separate asset can become partly marital by growing in value during the course of a marriage. Under the latter theory, the asset's value at the inception of the marriage retains its separate character, but any subsequent increase in value is treated as marital property to the extent that it results from active marital conduct: "Appreciation in separate property is marital if it was caused by marital funds or marital efforts; otherwise it remains separate." [38]

> To decide that active appreciation took place the court must make three subsidiary findings. First, it must find that the separate property in question appreciated during the marriage. Second, it must find that the parties made marital contributions to the property. Finally, the court must find a causal connection between the marital contributions and at least part of the appreciation.[39]

The burden of proving marital contributions and an increase in value is on the party who seeks to classify the appreciation as active.[40] The burden of proving that the marital contributions did not cause the increase in value rests with the party who owns the asset.[41]

The superior court did not clearly state whether transmutation or active appreciation made this asset marital. Using part of a premarital account for a marital purpose does not change the balance of the account into marital property so long as no new contributions of marital funds to the account are made. Karl testified that there were no contributions to the account during the marriage. Furthermore, this type of account is not normally subject to active appreciation.[42] We therefore conclude that the increase in value resulted from passive appreciation, and that the account remained premarital property. Because it was an abuse of discretion to classify this account as marital, we reverse the ruling as to this account and remand.

**F. Mada's Post–Retirement Health Insurance Benefit Is Partly Marital Property.**

■ Mada had a PERS defined benefit retirement account, which she both earned and cashed out before the marriage. Mada bought back her PERS account with marital funds and agreed to its characterization as marital property valued at $48,358. The superior court found that she also acquired, as part of the PERS benefit package, lifetime health insurance benefits that Karl cannot share. It found that this benefit was the result of Mada's premarital efforts, but that there was insufficient evidence to determine the amount of marital assets used to repurchase this asset. The court also found that even if the health benefits had been acquired with marital funds, there was no evidence that Karl could have used the benefits had the parties remained married.

Karl, citing AS 25.24.160(a)(4) and *Kinnard v. Kinnard*,[43] argues that because the health insurance benefits were reacquired using marital funds, they should have been treated as a marital asset. He asserts that their value is $85,762 and that it was error not to credit him with at least half the benefits' value.

Mada disagreed with Karl's expert's valuation of the health benefits, and asserts that they are not alienable. She also contends that no evidence was presented as to the

---

**38.** *Id.* at 857–58 (internal citations omitted) (quoting BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 5.22, at 230 (2d ed.1994) [hereinafter TURNER] ).

**39.** *Id.* at 858 (internal citation omitted).

**40.** *Id.* at 859 & n. 11.

**41.** *Id.* at 859 & n. 12.

**42.** *See In re the Marriage of Gottsacker v. Gottsacker*, 664 N.W.2d 848, 853 (Minn.2003) ("[A]n increase in the value of nonmarital property attributable to inflation or to market forces or conditions, retains its nonmarital character.") (citing *Nardini v. Nardini*, 414 N.W.2d 184, 192 (Minn.1987)).

**43.** *Kinnard v. Kinnard*, 43 P.3d 150, 156 (Alaska 2002).

amount of funds required to buy back the retirement and health benefits, or what the proportionate cost of each would have been. Mada argues that the coverage has no cash value and that the trial court correctly ruled that it was not subject to allocation.

■ Health insurance benefits earned during the marriage are a marital asset of the insured spouse.[44] That the benefits cannot be transferred is irrelevant, because "market transferability is not a prerequisite to determining value for property division purposes."[45] In *Martin v. Martin* we dealt with a similar issue involving frequent flyer miles.[46] The miles were non-transferrable, but "an asset need not be marketable if the court can objectively determine that it has value to its owner."[47] We therefore held that the superior court correctly characterized the frequent flyer miles as a marital asset.[48]

By using marital funds during the marriage, Mada reacquired the post-retirement health insurance benefits she earned before the marriage; the benefit is, therefore, at least in part a marital asset. As Karl argues, the benefit has value to Mada, and the court should have determined this value. We therefore vacate the ruling as to this asset and remand.

On remand Mada's retirement health insurance benefit should be divided into marital and nonmarital portions.[49] Courts in other jurisdictions have approved the division of

particular property into marital and nonmarital portions.[50]

Only the marital portion of the retirement health insurance benefit is divisible between Mada and Karl; benefits Mada has earned since the marriage ended are not marital. This is because post-divorce, pre-retirement health insurance benefits are compensation for contemporaneously performed work and are therefore separate property, whereas post-retirement health insurance benefits are compensation for work previously performed.[51] In this case, when Mada eventually retires, some of that work will have been performed during the marriage and some of it will have been performed after the marriage. For purposes of valuing Mada's retirement health insurance benefit, work she performed before the marriage must be treated as having been performed during the marriage because Mada used marital funds to buy back this part of the benefit.

The court should determine the percentage of the benefit that is marital by calculating the "coverture fraction."[52] This fraction is calculated by dividing the number of years worked during the period of coverture by the total number of years worked.[53] To the extent Mada used marital funds to buy back health benefits for work performed before the parties began living together, that period of work must be treated as part of the period of coverture.

---

**44.** *Id.*

**45.** *Martin v. Martin,* 52 P.3d 724, 731 (Alaska 2002).

**46.** *Id.*

**47.** *Id.*

**48.** *Id.*

**49.** *See Walek v. Walek,* 193 Misc.2d 241, 749 N.Y.S.2d 383, 386 (N.Y.Sup.2002) (holding that health insurance coverage component of husband's retirement benefits was marital asset subject to equitable distribution).

**50.** *See, e.g., Lampton v. Lampton,* 721 S.W.2d 736, 738 (Ky.App.1986) (dividing particular stock holding into marital and nonmarital portions); *Doucette v. Washburn,* 766 A.2d 578, 581, 587 (Me.2001) (dividing pension into marital and nonmarital portions); *Hoffman v. Hoffman,* 93 Md.App. 704, 614 A.2d 988, 998 (1991) (remanding to determine "the correct values of the mari-

tal and nonmarital portions" of a particular property); *Poach v. Poach,* 392 N.W.2d 749, 752–756 (Minn.App.1986) (valuating marital and nonmarital portions of asset); *Hall v. Hall,* 118 S.W.3d 252, 259 (Mo.App.2003) (stating that trial court should separate pension into marital and nonmarital portions); *Coughlin v. Coughlin,* 823 S.W.2d 73, 75 (Mo.App.1991) (dividing IRA into marital and nonmarital portions); *Sutliff v. Sutliff,* 361 Pa.Super. 504, 522 A.2d 1144, 1150 (1987) (dividing particular stock holding into marital and nonmarital portions).

**51.** BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 6.26 (2d ed. Supp.2004) [hereinafter TURNER SUPPLEMENT].

**52.** *See* TURNER, *supra* note 38 at § 6.10.

**53.** *Id.*

Our holding should not be read to suggest that the proceeds from health insurance are marital property.[54] When valuing the retirement health insurance benefit, the superior court should look to the amount of the premium subsidy provided by the employer, rather than to either the proceeds or the cost of procuring comparable insurance.[55]

There are inherent difficulties in attempting to calculate the value of this benefit. Because Mada had not yet retired at the time of trial, the evidence in the record makes it impossible to know with certainty how many years Mada will ultimately work. It is therefore impossible to calculate with certainty the percentages of marital and non-marital interests for the post-retirement health insurance benefit. Likewise, because we cannot know how long Mada will live, the total value of the employer's premium subsidy cannot be calculated with certainty.

Despite these uncertainties, sufficient evidence was presented in this case to place in issue the value of the retirement health care benefit; accordingly, the court on remand must exercise its discretion in fashioning an equitable division of this benefit.[56] It may, in its discretion, receive additional evidence relevant to the value of the benefit.

## IV. CONCLUSION

We REVERSE the property division order as to IRA A and the T. Rowe Price account, VACATE the order as to the health insurance benefits, and REMAND for further proceedings as to those property items. We AFFIRM the property division order in all other respects.

---

**54.** TURNER SUPPLEMENT, *supra* note 51 at § 6.26.

**55.** *See id.*

**56.** We note that Turner discusses principles governing the distribution of analogous retirement benefits. *See* TURNER, *supra* note 38 at § 6.11

("Methods for Distributing Retirement Benefits"). Given the difficulty of valuing and dividing retirement health insurance benefits and because the method of distribution has not been briefed in this case, we express no preference for any particular method.