NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BRIAN EDWARD MILLER, | ) | |
| | ) | Supreme Court No. S-17934 |
| Appellant, | ) | |
| | ) | Superior Court No. 3HO-19-00022 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| LORETA MILLER, | ) | AND JUDGMENT[*] |
| | ) | |
| Appellee. | ) | No. 1891 – May 11, 2022 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Homer, Jason M. Gist, Judge.

Appearances: Jimmy E. White, Hughes White Colbo & Tervooren, LLC, Anchorage, for Appellant. Elizabeth H. Ledue, Gilman & Pevehouse, Kenai, for Appellee.

Before: Winfree, Chief Justice, Maassen, Borghesan, and Henderson, Justices. [Carney, Justice, not participating.]

## I. INTRODUCTION

Brian and Loreta Miller divorced after nearly 15 years of marriage. During their marriage, Brian served in the United States Navy and worked as an anesthetist, acquiring an education, sizeable earnings, and retirement benefits. Meanwhile, Loreta was primarily a stay-at-home mother working occasional jobs. The superior court divided the marital estate 63/37 in Loreta's favor, emphasizing the parties' disparity in earning capacity. Brian appeals, disputing the court's findings concerning Loreta's limited earning capacity and Brian's substantial earning capacity, the valuation of Brian's

significant post-retirement medical benefits, the credit given to Brian for his various post-separation payments, and the overall property division. We affirm the superior court's judgment on all issues.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Brian Miller and Loreta Colaruotolo met in 1993 in Italy while Brian was serving in the United States Navy; they married the following year. Loreta immigrated to the United States with Brian soon afterwards.

Brian and Loreta had two children during their marriage. Prior to the birth of their children, Loreta — who did not have a college education — worked as a preschool teacher while Brian attended college and worked part time. When their first child was born, Brian and Loreta agreed that Loreta would primarily be a stay-at-home parent. Loreta focused on caring for the children, cooking, cleaning the home, and working part-time jobs.

While in the Navy, Brian studied to become a Certified Registered Nurse Anesthetist (CRNA). He obtained two associate's degrees, a bachelor's degree in nursing, and a master's degree in nurse anesthesia. The Navy paid for Brian's educational expenses while he was working toward these degrees; he also received full pay and benefits during this time because he was still enlisted.

Brian retired from the military in 2011, and the family moved to Homer in 2014. Brian continued to work as a CRNA, earning anywhere from $150,000 to $336,000 per year. Most recently, in 2019, he earned approximately $180,000. Loreta testified that when the family moved to Alaska, Brian discouraged her from working because it would only "add to his bottom line" and cost the couple more in taxes.

Upon retirement from the Navy, Brian began receiving a military pension. In 2019 this pension amounted to approximately $52,502 annually, adjusted for inflation.

Because of his military service, Brian also received and continues to be eligible for lifetime health insurance benefits called TRICARE. Before turning 65, Brian can choose from TRICARE Select or TRICARE Prime. TRICARE Select is free. TRICARE Prime has no monthly premium, but instead has an annual enrollment fee of $297. Under TRICARE Prime, roughly 80% of his medical expenses are covered, and his maximum annual out-of-pocket expenses are capped at somewhere between $3,000 and $5,000. Once he turns 65, Brian will be entitled to TRICARE for Life, a Medicare supplement policy, for the remainder of his life at no cost to him.

Brian and Loreta separated in 2018. Loreta went back to work, taking jobs as a preschool teacher, a preschool office employee, and a cook at a local restaurant. Most recently, during the winter of 2019, she had a U.S. Postal Service seasonal contract position paying $16 per hour. In her testimony Loreta estimated that her gross income in 2019 was approximately $16,000, although she later clarified that her income had been $18,350. She testified that she believed the most she could make working full time was $20,000 to $25,000 per year. She also testified that she has very little retirement savings and few contributions to Social Security due the nature of her work history.

During the course of the marriage, the couple acquired a variety of real and personal property, including the marital home in Homer. They had debt at the time of separation, including a mortgage, a credit card balance, and bills for remodeling work done on the marital home. Brian unilaterally closed the couple's joint bank accounts shortly before moving out of the marital home; he also consolidated and paid much of the marital debt by obtaining a consumer loan on the couple's truck. Brian calculated the amount of child support that he would owe between January 1 and May 22, 2019 and paid that to Loreta in a lump sum. He also paid Loreta between $1,000 and $1,250 per month in spousal support and paid the $2,700 monthly mortgage for the marital home

during the separation period. After separation Loreta sold some of their other real property in Homer for $150,000 and saved the proceeds in a separate account.

The parties agree that Loreta was entitled to half of Brian's pension earned during their marriage. They also agree that after the divorce Loreta will remain eligible for one year of free coverage under Brian's TRICARE. She will then be eligible to purchase TRICARE Select on her own out of pocket and at full cost for the next three years. After that period ends, Loreta will no longer be eligible for TRICARE and will have to acquire her own health insurance.

## B. Proceedings

Loreta filed a complaint for divorce in January 2019. At trial, both parties presented expert testimony on the value of Brian's military pension and lifetime health benefits. The experts used different methods to value the pension and benefits. Loreta's expert used an "actuarial approach," which valued the marital portion of Brian's post-retirement medical benefits at $196,720 and the marital portion of his pension at $983,339 — a total value of $1,180,059. Brian's expert used a "life expectancy" approach, which valued the marital portion of Brian's post-retirement medical benefits at $174,457 and the marital portion of his pension at $944,635 — a total value of $1,119,092. Each expert testified about the flaws of the other's approach. The superior court ultimately found the actuarial approach more compelling and adopted Loreta's expert's valuation of Brian's post-retirement medical benefits and pension.

The superior court issued its findings of fact and conclusions of law in August 2020. The court considered several factors in its property division, including the health of the parties, conduct by the parties that could have resulted in the unreasonable

depletion of marital assets, and the financial circumstances of both parties;[1] however, it emphasized the disparity in earning capacity between Brian and Loreta. It found that Loreta's "lack of education, training, and skills strongly suggest that it is unlikely that she will earn much more than [$25,000 per year] in the future." On the other hand, the court found that "Brian . . . has the education, training and skillset to earn at least $150,000 per year, and even well above that." In light of these findings, the court determined that the split Loreta had requested — 65/35 in her favor — was an equitable division of property. The court's actual property division resulted in a 63/37 split in Loreta's favor.

Brian moved for reconsideration on three grounds. First, he argued that the superior court failed to deduct the value of the months that already passed when valuing the military medical benefits that make up a large part of Brian's retirement. Second, he argued that the court had ordered a division of the military pension that was not permissible under federal law.[2] And third, he argued that it had mistakenly found that Loreta is unable to earn more than $25,000 per year.

The superior court agreed with Brian that he should receive an offset for the year of free medical benefits Loreta received after the divorce. The court also agreed that federal law prohibited it from granting Loreta more than 50% of Brian's pension. Noting that it "continue[d] to find the [63/37] allocation . . . of marital property" to be an "equitable division of assets," the court corrected its error by dividing Brian's pension

---

[1] *See* AS 25.24.160(a)(4). These factors are commonly referred to as the "*Merrill* factors," because AS 25.24.160(a)(4) codified and expanded the factors we listed in *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

[2] *See* 10 U.S.C. § 1408(e)(1) ("The total amount of the disposable retired pay of a member payable under all court orders pursuant to subsection (c) may not exceed 50 percent of such disposable retired pay.").

50/50 and adjusting other parts of the property distribution to achieve the same overall division. The court declined to reconsider its finding concerning Loreta's earning capacity and noted that even if Loreta could earn as much as $50,000 per year, Brian would still have a significantly higher earning capacity that would justify the overall division.

## C.    Appeal

Brian appeals, arguing that the superior court clearly erred by finding that Loreta's earning capacity after the divorce is $25,000 per year while his is $150,000, and by valuing his TRICARE benefits consistent with the actuarial approach used by Loreta's expert. Brian also contends that the court abused its discretion by improperly weighing his separate contributions to Loreta during the interim period of the divorce and his post-retirement medical benefits. Finally, Brian argues that the court abused its discretion by dividing the marital estate 63/37 in Loreta's favor.

## III.   STANDARD OF REVIEW

"[Superior] courts have broad discretion in fashioning property divisions."[3] A superior court's division of marital assets involves three steps.[4]

First, the superior court determines what property is available for distribution.[5] This step, "characterizing property as marital or non-marital, involves mixed questions of law and fact; 'we review the superior court's legal conclusions de

---

[3]     *Beal v. Beal*, 88 P.3d 104, 110 (Alaska 2004) (quoting *Edelman v. Edelman*, 3 P.3d 348, 351 (Alaska 2000)).

[4]     *Hockema v. Hockema*, 403 P.3d 1080, 1088 (Alaska 2017).

[5]     *Id.*

novo and its factual findings for clear error.' "[6]  "Clear error 'exists when "our review of the record leaves us with the definite and firm conviction that the superior court has made a mistake." ' "[7]   Brian does not challenge any of the superior court's determinations in this step of the property division.

Second, the superior court identifies the value of the property.[8]  This valuation of property is also a factual determination that we review for clear error.[9] "The [superior] court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the [superior] court, not this court, judges the credibility of witnesses and weighs conflicting evidence.' "[10]

Third, the superior court divides the property equitably.[11]  We review the equitable division of property for abuse of discretion.[12]  "A property division is an abuse of discretion if it is clearly unjust; it will also be set aside if it is based on a clearly erroneous factual finding or mistake of law."[13]

---

[6]     *Wiegers v. Richards-Wiegers*, 420 P.3d 1180, 1182 (Alaska 2018) (quoting *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015)).

[7]     *Ranes & Shine, LLC v. MacDonald Miller Alaska, Inc.*, 355 P.3d 503, 508 (Alaska 2015) (quoting *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006)).

[8]     *Hockema*, 403 P.3d at 1088.

[9]     *Id.*

[10]    *Downs v. Downs*, 440 P.3d 294, 298 (Alaska 2019) (quoting *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014)).

[11]    *Hockema*, 403 P.3d at 1088.

[12]    *Id.*

[13]    *Wagner v. Wagner*, 386 P.3d 1249, 1251 (Alaska 2017).

## IV.  DISCUSSION

### A.  The Superior Court Did Not Clearly Err By Finding That Loreta Was Unlikely To Earn More Than $25,000 Per Year.

The superior court found that "Loreta has never earned more than $25,000 per year in any given job."  It also noted that "[h]er lack of education, training, and skills strongly suggest[s] that it is unlikely that she will earn much more than that in the future," let alone an income "close to what Brian is capable of earning."  The court did not reconsider its finding that Loreta was unlikely to earn more than $25,000 per year, yet observed that even if Loreta were to make $50,000 per year, a 50/50 division would still be inequitable.[14]

Brian argues that the superior court clearly erred by finding Loreta was unlikely to earn more than $25,000 per year.  He contends that Loreta's claim that she earned only approximately $19,000 in 2019 was based on seasonal employment with the U.S. Postal Service.  He claims that Loreta had "prospects for the job to continue" and that had she worked full time for the entire year, she would have made over $33,000.

The superior court was not required to extrapolate from Loreta's 2019 earnings from the Postal Service that she could earn $33,000 per year.  Loreta had never earned that much in a single year.  Furthermore, the record did not establish that she could obtain full-time, year-round work with the Postal Service.  Loreta testified that she delivered packages in Homer during the winter holidays in 2019.  But there was no evidence indicating that she could translate that seasonal job into more.

---

[14]     The *Merrill* factors require a superior court dividing a marital estate to consider "the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage."  AS 25.24.160(a)(4)(C).

In addition, Loreta testified that she believed the most she could make working full time was $20,000 to $25,000 per year. Loreta had primarily been a stay-at-home parent after her and Brian's first child was born. She focused on caring for the children, cooking, cleaning the home, and doing "odd jobs." After she and Brian separated in 2018, Loreta took jobs as a preschool teacher, a preschool office employee, and an assistant cook at a local restaurant. She presented evidence that her gross income in 2019 was $18,350. The superior court did not clearly err by finding that Loreta was unlikely to earn more than $25,000 per year.

**B.     The Superior Court Did Not Clearly Err By Finding That Brian Has The Capacity To Earn At Least $150,000 Per Year.**

The superior court found that Brian has the capacity to earn at least $150,000 per year. Brian argues that in reaching that figure, the superior court did not give enough weight to his impending unemployment status or his difficulty finding employment in Alaska. Brian claims that his options for full-time employment in his field are scarce. He contends that he sought employment with two medical providers in Anchorage, but both positions were only temporary and one later fell through. He also suggests that a non-compete agreement prevented him from obtaining employment at Central Peninsula Hospital in Soldotna, and that after the non-compete agreement expired, the hospital did not have open positions.

The superior court's finding was not clearly erroneous. Brian testified that although he was then living in Seattle and working at a hospital there, he had submitted a letter of resignation and was planning to leave his job on May 1, 2020. He also testified that his Seattle employer — who paid him between $180,000 and $190,000 per year — had asked him to stay. Brian could have chosen to continue working there, which would have allowed him to maintain a high income. Instead, he voluntarily resigned from that job, explaining that he was going to move from Seattle back to Homer

to move in with his girlfriend and take a few months off from work for a mental-health break. Although Brian might prefer to work in southcentral Alaska and his desire for time off from his demanding job is understandable, the evidence supports the court's finding that Brian has the *capacity* to "go back into the medical field and earn a living as he did before" based on his education, training in nurse anesthesia, skills, and previous work experience.

C. **The Superior Court Did Not Abuse Its Discretion When Weighing Brian's Post-Separation Payments And Contributions.**

Brian argues that the superior court abused its discretion by "disregard[ing]" his post-separation contributions to Loreta. He contends that he: (1) refinanced his truck to consolidate and pay off many of the marital debts, including a $23,000 credit card balance and a boat loan; (2) continued to pay the mortgage on the couple's marital home in Homer; and (3) paid Loreta about $2,000 per month plus a lump sum for child support. He argues that these "positive actions," which were "done without the need for a court order," should be considered in the court's property division.

Superior courts must consider and may credit a spouse for contributions from post-separation income.[15] Contributions to be considered include payments made to maintain marital property.[16] However, the court is not obligated to award "dollar-for-dollar credit," and should consider "whether [any] credit should be offset by the value of the benefit of post-separation use."[17]

---

[15] *Beals v. Beals*, 303 P.3d 453, 463 (Alaska 2013); *see also Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992).

[16] *Beals*, 303 P.3d at 464 (citing *Rodriguez v. Rodriguez*, 908 P.2d 1007, 1013 (Alaska 1995)).

[17] *Id.*; *see also Ramsey*, 834 P.2d at 809 (stating that there is "no fixed rule (continued...)

The superior court gave Brian dollar-for-dollar credit for the mortgage payments, boat loan payments, boat repairs, truck loan payments, money he spent removing trash from the couple's home, and miscellaneous marital bills he paid after the couple separated. The credit totaled $85,010.99 — the same amount Brian requested. It is unclear what more the superior court could have done to credit Brian for his payments and contributions in the interim of the divorce. And we decline to hold that the superior court should have gone beyond crediting Brian to reward him for taking preemptive "positive actions." Brian cites no authority suggesting that a party's proactive efforts to divide portions of the marital estate prior to trial should be met with a more favorable division of the overall estate. His post-separation actions, although commendable, do not entitle him to a more favorable split of the marital estate.

**D.    The Superior Court Did Not Clearly Err By Valuing Brian's Post-Retirement Medical Benefits, Nor Did It Abuse Its Discretion In Weighing Them.**

After hearing testimony from each party's expert witness on the value of Brian's post-retirement medical benefits, the superior court adopted the valuation of Loreta's expert. Loreta's expert used an "actuarial approach," which valued the marital portion of Brian's medical benefits at $196,720.[18] In contrast, Brian's expert used a "life expectancy" approach, which valued the marital portion of Brian's medical benefits at $174,457. Loreta's expert calculated a value of the benefits out to age 115 but

---

[17]    (...continued) requiring credit in all cases" and that payments from separate income should be considered as one circumstance to be weighed by superior court in dividing marital estate).

[18]    On Brian's motion for reconsideration, the superior court revised its valuation of his medical benefits to $188,901.88 to offset the one free year of TRICARE Loreta received after the divorce.

discounted each year with a "mortality rate," which is the likelihood that Brian will live to be that age.[19] Brian's expert similarly applied a mortality rate to each year of life, but only calculated the value of the benefits out to age 81, which the Internal Revenue Service has determined to be the average life expectancy of men with Brian's birth date.

Brian first argues that the superior court clearly erred by accepting Loreta's expert's calculation of the post-retirement medical benefits' value over his own expert's calculation.[20] We disagree.

Post-retirement medical benefits (including TRICARE benefits) earned during marriage are a marital asset of the insured spouse.[21] In *Hansen v. Hansen* we recognized the difficulty of valuing these benefits, observing that because it is unknown how long the insured spouse will live, "the total value of the employer's premium subsidy cannot be calculated with certainty."[22] Despite these uncertainties, the superior court must value and equitably divide post-retirement medical benefits where "sufficient evidence [is] presented" to place the value of the benefits at issue.[23] In *Burts v. Burts* we rejected the argument that TRICARE benefits are too speculative to be valued and cited

---

[19] To illustrate, Loreta's expert assigned a 99.0426% probability of Brian living to be 52 years old, but only a 0.0002% chance of his living to be 115 years old.

[20] *Engstrom v. Engstrom*, 350 P.3d 766, 769 (Alaska 2015) ("[T]he valuation of assets 'is a factual determination that we review for clear error.'" (quoting *Beals*, 303 P.3d at 459)).

[21] *Hansen v. Hansen*, 119 P.3d 1005, 1015 (Alaska 2005); *Burts v. Burts*, 266 P.3d 337, 346 (Alaska 2011).

[22] 119 P.3d at 1016.

[23] *Id.*; *see also Grove v. Grove*, 400 P.3d 109, 114 (Alaska 2017) ("The nature of [the husband's] post-retirement medical benefits does not relieve the superior court of responsibility for determining their value.").

sources explaining how to objectively value them.[24] We have also instructed superior courts "to rely on expert testimony and value [post-retirement medical] benefits consistent with Alaska law."[25]

The superior court considered the testimony of each party's expert and made a reasoned decision to rely on the actuarial approach over the life expectancy approach. The court found the actuarial approach used by Loreta's expert "more persuasive," in part because the life expectancy approach of Brian's expert "applies a 58.5% chance of Brian living to the age of 81 and applies a 'mortality rate' discount to the value for that year, yet then assumes 100% chance of death at 82 years of age." Because the court saw "more support and reason" in the actuarial approach, it adopted Loreta's expert's valuation of Brian's post-retirement health benefits.

We approved the use of the actuarial approach to value TRICARE benefits in *Burts*, rejecting the notion that the actual life expectancy of the recipient must be the basis for the valuation.[26] Here, Loreta's expert assigned a very low probability of Brian living to age 115; accounting for that unlikely scenario added only $0.03 to the estimated value of Brian's medical benefits for that year of his life. We do not find the superior court's adoption of a value based on the actuarial approach to be clearly erroneous.

Brian next argues that the superior court abused its discretion by assigning disproportionate value to his "illiquid" and "speculative" medical benefits. He contends that giving "full value" to his medical benefits, which make up a large proportion of the

---

[24]     266 P.3d at 342-43, 343 n.30 (first citing TRACY FOOTE, MILITARY DIVORCE TIPS 17 (2010); and then citing MARK E. SULLIVAN, THE MILITARY DIVORCE HANDBOOK 522 (Am. Bar Ass'n 2006)).

[25]     *Wilkins v. Wilkins*, 440 P.3d 194, 197 (Alaska 2019); *see also Grove*, 400 P.3d at 115.

[26]     266 P.3d at 347.

estate, results in an "unjust outcome" because the property division ultimately leaves Loreta with cash in hand and Brian in debt.

We see no abuse of discretion in the superior court's weighing of Brian's post-retirement medical benefits. As Brian concedes, the superior court had flexibility to determine how to weigh and allocate these benefits.[27] Loreta will need health care after the divorce and will likely need to pay out of pocket until she qualifies for Medicare at age 65. And, as she points out, Brian has not suggested any alternative method of distributing his health benefits. Moreover, the superior court's distribution of property was primarily based on the parties' earning capacity, rather than factors related to Brian's medical benefits. Although the value of Brian's post-retirement medical benefits may be to some extent speculative, and these benefits are not equivalent to cash in hand, the superior court did not give them unreasonable weight when dividing the marital estate. The superior court's weighing of Brian's post-retirement medical benefits in the context of the overall property division was therefore not an abuse of discretion.

E.    **The Superior Court Did Not Abuse Its Discretion By Dividing The Marital Estate 63/37 In Loreta's Favor.**

The superior court distributed the marital estate 63/37 in favor of Loreta in light of the "extreme disparity in each party's ability to recover financially from [the] divorce." It reasoned that although awarding a 50/50 split would allow the parties to leave the marriage on relatively equal footing, Loreta has much less opportunity to rebuild her financial standing due to her "lack of education, training, and skills." The court also found that Loreta's job prospects will likely require her to purchase her own health insurance. The court's division left Loreta with $991,298.42 and Brian with $630,181.63 in marital assets.

---

[27]    *See Grove*, 400 P.3d at 112 ("We review . . . the equitable allocation of property[] for an abuse of discretion, reversing only if it is 'clearly unjust.' ").

Alaska law requires property divisions to be made "in a just manner and without regard to which of the parties is in fault."[28]  A superior court generally has broad discretion when dividing property in a divorce proceeding.[29]  It must, however, consider the so-called *Merrill* factors in its division:  (1) "the length of the marriage and station in life of the parties during the marriage;" (2) "the age and health of the parties;" (3) "the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibility for children during the marriage;" (4) "the financial condition of the parties, including the availability and cost of health insurance;" (5) "the conduct of the parties, including whether there has been unreasonable depletion of marital assets;" (6) "the desirability of awarding the family home, or the right to live in it . . . to the party who has primary physical custody of children;" (7) "the circumstances and necessities of each party;" (8) "the time and manner of acquisition of the property in question;" and (9) "the income-producing capacity of the property and value of the property at the time of the division."[30]

The superior court is not required to enter findings for each factor.[31]  However, the superior court's findings regarding the division of property must be sufficient to indicate a basis for its conclusions.[32]  "Given adequate factual findings, and a demonstration that the [superior] court weighed those facts in reaching its conclusion,

---

[28]     AS 25.24.160(a)(4).

[29]     *Bussell v. Bussell*, 623 P.2d 1221, 1222 (Alaska 1981).

[30]     AS 25.24.160(a)(4); *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

[31]     *Oberhansly v. Oberhansly*, 798 P.2d 883, 884-85 (Alaska 1990).

[32]     *Id.* at 885.

we will not overturn a property division unless it is clearly unjust."[33]  "An equal division of property is presumptively equitable."[34]  However, "an unequal division may be required to achieve equity."[35]

Brian argues that the *Merrill* factors do not support a 63/37 division of the marital estate.  At core, Brian challenges the outcome of the division, which "leaves Loreta with over $1 million and Brian with a balancing payment."  He argues that "[t]here must be equitable consideration given to circumstances like this."  Although Brian is correct that the division does not leave him with many liquid assets, we believe the superior court's justification for the 63/37 division in favor of Loreta is reasonable because Brian is capable of earning significantly more income than Loreta and, unlike Loreta, will never have to pay for health insurance.

The superior court relied on *Burts v. Burts* in distributing the marital estate.[36]  In that case, the superior court awarded 57% of a marital estate to one party to the divorce and the remaining 43% to the other.[37]  We affirmed the division, noting that the superior court "observed a significant disparity" between the parties' earning capacities:  One was expected to earn about $35,000 per year with few benefits, while the other was expected to continue earning over $62,000 per year with significant

---

[33]     *Id.* (quoting *Wanberg v. Wanberg*, 664 P.2d 568, 574 n.20 (Alaska 1983)).

[34]     *Downs v. Downs*, 440 P.3d 294, 297 (Alaska 2019) (quoting *Brennan v. Brennan*, 425 P.3d 99, 106 (Alaska 2018)).

[35]     *Id.* (quoting *Jones v. Jones*, 942 P.2d 1133, 1137 (Alaska 1997)).

[36]     266 P.3d 337 (Alaska 2011).

[37]     *Id.* at 348.

benefits.[38]  We concluded that this discrepancy was one of several factors that "readily support[ed] an unequal distribution of the marital estate."[39]

The difference in earning capacity between Brian and Loreta is even starker than in *Burts*.  The superior court found that Brian has the capacity to earn "at least $150,000 per year, and even well above that," while Loreta's earning capacity is significantly lower.  The court found that even if Loreta could earn $33,000 per year, as Brian alleged, the disparity between the parties' earning potential would still be vast.  It noted that although "[b]oth parties will spend a considerable amount of time rebuilding their financial lives[,] Loreta's options on that front are extremely limited . . . while Brian's options are limitless if he chooses to take them."  Brian argues that the superior court overlooked his health problems — including various orthopedic issues, hypertension, migraines, and low testosterone —  in arriving at the conclusion that he had the capacity to earn at least $150,000 per year.  But Brian failed to produce evidence that these health problems prevent him from working.  Absent such evidence, the court properly determined Brian's earning capacity based on his education, training, skillset, and earnings history.

The superior court cited other factors in support of a 63/37 distribution of the marital estate.  For example, it highlighted the fact that Brian will receive free health insurance for the rest of his life, whereas Loreta will likely have to purchase her own after the divorce.[40]  The court also found that Loreta's sale of real properties in Homer for $150,000 instead of $160,000 did not constitute an unreasonable depletion of marital assets, reasoning that even if Loreta should have sold the lots for more, the $10,000

---

[38]     *Id.*

[39]     *Id.*

[40]     *See* AS 25.24.160(a)(4)(D) (availability of health insurance).

difference did not amount to unreasonable depletion in the context of the parties' total marital assets.[41] These findings, which Brian does not dispute, do not indicate that the unequal division was an abuse of discretion.

We note that an additional factor that the superior court did not mention further supports the unequal division of the marital estate: Brian's military disability pay. Brian receives veterans disability compensation from the U.S. Department of Veterans Affairs. We held in *Guerrero v. Guerrero* that military disability pay is a spouse's separate property, and the superior court may not divide this benefit in divorce.[42] But the court can certainly consider the fact that one spouse receives this substantial benefit when fashioning the overall equitable division of the marital estate.[43] Taken together, Brian's much higher earning capacity, receipt of lifetime health insurance benefits, and military disability pay demonstrate that the superior court did not abuse its discretion by dividing the marital estate 63/37.

## V.    CONCLUSION

We AFFIRM the superior court's decision on all issues.

---

[41]    *See* AS 25.24.160(a)(4)(E) (unreasonable depletion of marital assets).

[42]    362 P.3d 432, 441 (Alaska 2015).

[43]    *Id.* at 445 (noting that on remand parties' financial conditions, including husband's receipt of military disability retirement benefits, must be considered when equitably dividing marital estate); *see also Jordan v. Jordan*, 480 P.3d 626, 638 (Alaska 2021) (rejecting husband's argument that "VA disability payments have no bearing on an equitable division of marital property").